

FILED

Jul 05 2016, 10:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nathaniel Lee
Lee & Fairman, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

James F. Bleeke
Bleeke Dillon Crandall
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Green, *Appellant-Petitioner,* <br><br> v. <br><br> Stephen Robertson, Commissioner, Indiana Department of Insurance, *Appellee-Respondent.* | July 5, 2016 <br><br> Court of Appeals Case No. 49A02-1509-MI-1487 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable John M.T. Chavis, II, Judge <br><br> Trial Court Cause No. 49D12-1412-MI-40514 49D05-1412-MI-40514 |

**Robb, Judge.**

## Case Summary and Issues

[1]     John Green filed a petition for excess damages from the Indiana Patient's Compensation Fund ("PCF") after settling a medical malpractice claim against Health and Hospital Corporation of Marion County d/b/a Wishard Memorial Hospital ("Wishard") and Emergency Medical Group, Inc. ("EMG"). The trial

court awarded Green an additional $300,000.00. Green appeals, raising several issues, which we consolidate and restate as whether the findings and judgment of the trial court are clearly erroneous. Concluding the trial court's findings and judgment are not clearly erroneous, we affirm.

## Facts and Procedural History

Around 2:00 a.m. on March 29, 2008, Green lost control of his legs and fell in his bedroom. Green was also experiencing ringing in his ears, headache, nausea, and vomiting. Once Green realized he could not get up from the floor, he told his fiancée, Elaine Wise, to call 911. Fire department records indicate an ambulance was dispatched at 2:28 a.m. and arrived at Green's home at 2:35 a.m. Green's "chief complaint" was listed as "vomiting/weakness" and the paramedic's notes indicate Green complained of "nausea, vomiting, weakness, lightheadedness starting approx 3 hrs prior." Appellee's Appendix at 19. The ambulance departed at 2:45 a.m. and transported Green to Wishard, arriving at 3:00 a.m. Emergency room records indicate Green's condition was assessed "non-urgent." *Id.* at 24.

At approximately 3:30 a.m., Wise called Green's daughter, Geneisha Berry, to inform Geneisha of her father's condition. Geneisha immediately called her brother, John Berry, and both children set out for Wishard. Green was first examined by a physician at 4:30 a.m., and his children arrived between 4:00 and 5:00 a.m. Geneisha and John recall their father was experiencing numbness and loss of motor function on the left side of his body, drooping on

the left side of his face, headache, and difficulty speaking. Yet, Wishard staff did not document any of these symptoms, all of which indicated Green was experiencing a stroke. Dr. Becky Doran ordered an abdominal x-ray to evaluate Green's gastrointestinal symptoms, but the results were "unremarkable." *Id.* at 134. Dr. Jeff Hamman ordered an electrocardiogram to determine whether Green was experiencing a heart attack; he was not. Ultimately, Green was diagnosed with nausea and vomiting and prescribed an anti-nauseant.

[4]     Dr. Jordan Schmitt discharged Green from Wishard at 12:51 p.m. Geneisha and John recall their father could not stand on his own when he was discharged and had to be lifted into a wheelchair in order to leave the hospital. When they reached Wise's car in the parking lot, John had to lift him again. Once John lifted Green and placed him in the vehicle, Green was unable to pivot his body to face forward in the seat; John had to pick up his limbs, turn him, and place his limbs inside the vehicle. When Green arrived home, John lifted Green out of the vehicle and helped Green walk to the door. Green was unable to move his left side, so John was "carrying that half of him." *Id.* at 62. Green "was actually feeling worse" than when he arrived at Wishard earlier that day. *Id.* at 46. His condition did not improve:

> Q.     Okay. Were you still having problems when you left Wishard Hospital?
>
> A.     Yes.
>
> Q.     So the problems that you had that took you to Wishard

Hospital never got better?

A. No.

Q. They just continued?

A. Uh-huh. And got worse.

*Id.* at 172 (Deposition of John Green); *see also* Plaintiff's Exhibit 12 (Answer to Dr. Doran's Interrogatory No. 12, in which Green states, "My condition got worse after being released from Wishard Hospital.").

[5] On March 30, 2008, Green's friend and former physician, Dr. Earnest Berry, stopped by to visit Green. Dr. Berry suspected Green had suffered a stroke:

> When I got to his house, I went in and he was in a chair facing the wall. I came from the back. And when I said "John" . . . he tried to turn around, and I went in front of him and I noticed that he had slurred speech, he couldn't get up with[out] help, and he had upper extremity – left upper extremity – I think at that time the left upper extremity wasn't moving. And at that point I thought maybe it was a stroke . . . . His wife was there and his daughter was there and I asked them what had happened and they told me . . . he had gone to Wishard the night before and that was it. So I said let's get him to the hospital.

Appellee's App. at 183. Green was admitted to St. Vincent Hospital ("St. Vincent") around noon. Dr. Mark Janicki concluded Green did suffer a stroke:

> [Green] is a 56-year-old gentleman who had been seen at Wishard Hospital [the day] before this admission. He presented with severe dizziness, nausea and trouble walking. He was released after nothing acute was found. He was reevaluated in

our Emergency Room, again, with nausea and difficulty walking and now with a left facial droop. He is also experiencing slurred speech. . . . An MRI scan performed . . . showed an acute left cerebellar stroke and a right occipital stroke. . . .

*Id.* at 30 (St. Vincent Discharge Summary). Green was released from St. Vincent on April 4, 2008, and transferred to Rehabilitation Hospital of Indiana for physical, occupational, and speech therapies. He was released to go home several weeks later but subsequently required two surgeries because his left eyelid no longer closed on its own, resulting in permanent corneal scarring.

[6] On February 19, 2010, Green filed a proposed complaint with the Indiana Department of Insurance against Wishard, Dr. Hamman, Dr. Schmitt, and Dr. Doran. On December 9, 2014, the parties reached a settlement, which provided Wishard and EMG would pay Green a structured settlement totaling $250,000.00.[1] On December 11, 2014, Green filed a petition for excess damages from the PCF, which alleged in relevant part:

> 5. Plaintiff John Green presented to the Emergency Room at [Wishard] on March 29, 2008 with facial drooping and inability to stand up and maintain his balance and was discharged after being evaluated by agents of Wishard for which the hospital is vicariously liable . . . .
>
> 6. John Green was admitted the following day to St. Vincent's Hospital for a stroke and has residuals from the stroke.

---

[1] The nature of EMG's involvement and liability in this matter is unclear from the record.

7.    Defendants breached and violated their duty to Plaintiff
      John Green in one or more of the following ways:
      a.    They failed or refused to adequately
            assess/evaluate/treat John Green's condition.

8.    As a direct and proximate result of the negligence and/or
      medical malpractice of Defendants, Plaintiff John Green
      was injured.

Appellant's Appendix at 7.  At the excess damages stage, Green maintained he was experiencing a transient ischemic attack ("TIA") when he arrived at Wishard, subsequently experienced an acute ischemic stroke, and was injured by the physicians' failure to administer tissue plasminogen activator ("tPA"), a clot-busting drug used to treat strokes.[2]  He requested the trial court award $1,000,000.00 in excess damages.  The PCF maintained Green was fully compensated by the underlying settlement.

[7]    A bench trial was held on June 19, 2015.  The trial court admitted into evidence the depositions of Green, Green's children, physicians who treated Green, and a United Auto Workers Union ("UAW") representative.  The PCF called Dr. Kevin Puzio, a neurologist, as an expert witness.  Green called Dr. Debra

---

[2] By contrast, in his Submission of Evidence to the Department of Insurance, Green maintained,

> Green was denied the rapid response for his ischemic stroke during the so called "golden window" of opportunity for effective treatment which is the key to minimizing the effects of a stroke; this was due to the misdiagnosis of his condition by the Wishard Hospital Emergency Department staff. . . .  If a stroke is promptly and correctly diagnosed, lasting damage can often be avoided by the administration of blood thinning/clot dissolving medication . . . .  [B]y the time he was treated at St. Vincent Hospital the next day, it was too late.

Pl.'s Ex. 24.

Carter-Miller, his primary care physician; Dr. Claude Anderson, his optometrist; and Michael Blankenship, a vocational rehabilitation expert. On June 29, 2015, the trial court entered its findings and conclusions and awarded Green an additional $300,000.00 in damages. The trial court's findings included the following:

1. This case arises from the alleged injuries Mr. Green experienced following a stroke on March 29, 2008, which were caused by the failure of doctors and staff at [Wishard] to diagnose Mr. Green's stroke and treat him with [tPA], a medication that reduces clotting factors in an effort to break up or eliminate clots in affected arteries.

* * *

6. At Wishard Hospital, Mr. Green experienced left-sided numbness, drooping facial features, loss of motor function, and could not speak. Mr. Green's children, John Berry and Geneisha Berry, visited him at Wishard Hospital, and stated that he was almost falling out of bed, was not making sense when he tried to speak, and could not walk.

7. Time is of the essence in assessment of emergency conditions and there was a "Golden Window" of three (3) hours to administer tPA, so that critical time was lost.

* * *

10. Wishard Hospital staff observed Mr. Green and diagnosed him with vomiting and discharged him that day without diagnosing his stroke or providing treatment with tPA.

11. The Wishard Hospital records did not document Mr. Green's neurologic findings. Dr. Puzio explained that the physicians and staff at Wishard Hospital apparently had incorrectly focused on a gastrointestinal problem, and had

negligently failed to document Mr. Green's neurologic symptoms of a stroke. Thus, Dr. Puzio placed greater weight upon the history provided by Mr. Green and his children, which explained that Mr. Green could not walk or talk coherently throughout the time he was at Wishard Hospital. The Court concludes that the factual testimony of Mr. Green and his children detailing Mr. Green's symptoms of inability to walk or talk, and of left-sided weakness are more reliable than the Wishard Hospital Chart, which fails to document anything about Mr. Green's neurologic status.

12. Mr. Green returned home and continued to experience left-sided numbness affecting his face, arms and legs, the loss of control of his legs, difficulty speaking, and difficulty moving.

* * *

14. Dr. Berry went to Mr. Green's home and examined him. Dr. Berry opined that Mr. Green experienced a stroke-in-progress when he initially presented to Wishard Hospital. Dr. Berry testified that Mr. Green was not experiencing a transient ischemic attack ("TIA") because his symptoms were continuous and did not resolve with time . . . .

15. Mr. Green was admitted for additional treatment at St. Vincent at approximately 12:20 p.m. on March 30, 2008, and was treated by Dr. Mark Janicki, a board certified neurologist. Dr. Janicki testified that Mr. Green was suffering from a stroke in his basilar artery that affected his left cerebellum and right occipital lobe. Symptoms associated with this type of stroke include incoordination of left side, right side vision problems, double vision, slurred speech, and facial droop. These symptoms develop very quickly after the stroke begins.

16. Dr. Janicki testified that tPA was the only thing we have to treat ischemic strokes and that in 90 days, 39% of patients who had tPA did better than those who did not receive it.

17. Dr. Janicki is . . . familiar with tPA and agrees that it does not always work. He testified that "people don't miraculously get better after tPA is delivered." Dr. Janicki also testified that he cannot say whether Mr. Green would have had a better recovery if he had received tPA.

18. As a result of his stroke on March 29, 2008, Mr. [G]reen experiences hearing loss in his left ear, difficulty with balance and coordination, and . . . numbness.

19. Mr. Green was hospitalized at St. Vincent for several days and referred to physical therapy as a result of his March 29, 2008 stroke. Dr. Debra Carter-Miller, Mr. Green's treating family physician, testified that even if Mr. Green had been promptly given tPA, his ongoing care would have been very similar to monitor the progress of his recover[y] after his stroke. Dr. Carter-Miller opined that all stroke patients are initially hospitalized for one or two days in the Intensive Care Unit; patients are then transferred to the hospital floor for several more days of observation; finally, patients are sent to rehabilitation for therapy and recovery. Dr. Kevin J. Puzio, a board-certified neurologist, agreed with this pattern of care for stroke patients, stating that even with successful tPA treatment, recovery and therapy for a stroke requires extensive hospitalization and rehabilitation therapy.

20. Dr. Puzio examined Mr. Green on May 6, 2015, at the request of the PCF and also reviewed Mr. Green's medical records and interpreted his CT scans and MRI's. Dr. Puzio stated that the tPA is a thrombolytic that attempts to dissolve clots and restore blood flow to blocked arteries. Dr. Puzio explained that tPA is most effective in treating relatively small clots in small arteries. It is less effective in clearing blockages in medium-sized and larger arteries, such as the basilar and vertebral arteries that were involved in Mr. Green's stroke.

21. Dr. Puzio opined that on March 29, 2008 Mr. Green

experienced an acute stroke that resulted from a blood clot in his basilar artery, which is a medium-sized artery that feeds his brain stem in the back of his neck. The clot in Mr. Green's basilar artery then broke off and caused a clot in his posterior cerebral artery, which is a smaller artery feeding his occipital lobe. Symptoms associated with this type of stroke include nausea, vomiting, and incoordination.

22. Dr. Puzio opined that Mr. Green did not experience a transient ischemic attack, because his stroke symptoms never resolved, as evidenced by the testimony of Mr. Green and his two children, who all testified that he could not walk and had facial drooping and difficulty speaking throughout his time at Wishard Hospital. Mr. Green's acute stroke is what prompted him to seek treatment at Wishard on March 29, 2008, (and thus, it preceded the medical negligence at issue in this case.)

23. Dr. Puzio noted that Mr. Green's CT scan and MRI revealed that he had experienced several micro-strokes before his acute stroke on March 29, 2008. These small, old strokes were not transient ischemic attacks, because they resulted in permanent damage to Mr. Green's brain. Dr. Puzio opined that these prior micro strokes resulted in reduced brain tissue reserve that made a full recovery medically improbable, even with prompt administration of tPA therapy. Dr. Puzio also explained that the moderate blockage of Mr. Green's basilar artery and the previous small strokes demonstrate a history of "very chronic undertreated hypertension."

24. Dr. Puzio opined that if Mr. Green had received tPA in a timely manner, he would have likely regained additional function in the area of the brain that receives blood supply from the posterior cerebral artery. A decreased infarction of Mr. Green's posterior cerebral artery likely would have primarily improved his balance and coordination. Dr. Puzio stated that the [b]rain stem which receives blood supply from the larger basilar artery would be unlikely to have been significantly improved with tPA

therapy. Thus, Mr. Green's hearing and ability to assimilate and work around moving objects would be unlikely to have been improved with tPA treatment. Overall, Mr. Green's symptoms likely would have improved as follows:

> A. Mr. Green's double vision, loss of motor control, and balance problems would be slightly improved, but would not likely have returned to normal;
> B. Mr. Green's hearing loss would not have been improved;
> C. Mr. Green would still be expected to have some deficits based on the distribution of his stroke; and
> D. Mr. Green likely would continue to have significant fatigue and stamina issues for years.

25. Dr. Puzio testified it is rare that a stroke patient returns to and continues a full-time job after a stroke due to fatigability and trouble maintaining focus. Dr. Puzio testified that he would not have released Mr. Green to return to work in the auto industry after his stroke because of safety concerns. The Court acknowledges that Mr. Green continues to be so fatigue[d] that he fell asleep during the damages hearing on June 19th. Thus, the Court agrees that Mr. Green's fatigue and lack of stamina would probably prevent Mr. Green from performing most jobs. Dr. Puzio explained that fatigue problems would have been an issue for Mr. Green even if he had been treated successfully with tPA.

26. Dr. Puzio acknowledges that it is not possible to predict exactly what Mr. Green's precise recovery would have been if he had been successfully treated with tPA. However, Dr. Puzio stated that he could use his 30 years of experience treating thousands of stroke patients, his review of the statistics in the medical literature, and the location and extent of Mr. Green's presenting stroke symptoms to state to a reasonable degree of medical probability that Mr. Green would have still had substantial deficits that would prevent him from returning to work even with successful tPA therapy.

27. The seventh nerve palsy was documented in the assessment of John Green on 3-31-08 at St. Vincent Hospital for the first time and Dr. Claude Anderson testified that this medical condition usually develops within 1 hour – a short period of time following a stroke. To treat [Green's] condition, the surgical procedure resulted in a gold bar being placed in his eyelid to assist in closure. The patient is required to engage in regular treatment on his eyes for the remainder of his life on a daily basis.

28. Dr. Anderson opined that John Green sustained permanent corneal scarring and will require being seen two times a year for his lifetime and will require ointment and lubricants.

29. Mr. Green must tape his eye closed every night or this can lead to further corneal scarring and can lead to blindness.

30. Mr. Green can drive himself in his own vehicle, but he normally only drives short distances, and does not drive at night due to vision limitations. These limitations have caused him to lose a portion of his freedom.

31. Mr. Green's talents and abilities to play golf have been greatly diminished by the negligence of Wishard.

32. Mr. Green currently walks without assistance of a cane, walker or other assistive device; however, his balance has still been diminished by the stroke.

33. On February 28, 2007, Mr. Green, at the age of 57, accepted a buyout package from his employer, Ford Motor Company.

* * *

35. Mr. Green did not work at any job that produced income for thirteen months up to the time of his stroke on March 29, 2008 . . . .

36. Mr. Green told his vocational rehabilitation expert, Michael Blankenship that he hoped to return to Purdue University to complete his engineering degree and then obtain a master's degree to start his own engineering company. . . .

37. Mr. Blankenship stated that it would be unrealistic for Mr. Green to work in the auto industry and pursue his dream of completing his education at Purdue.

38. Mr. Green offered the testimony of [a UAW representative], who stated . . . very few people were being hired into the auto industry in 2008 and 2009 due to the significant economic downturn . . . .

* * *

41. Mr. Green testified that he intended to invest in real estate following his elective retirement. In the 13 months after he left Ford, Mr. Green attended real estate seminars around the country.

42. Mr. Green then purchased two residential properties after his injury on March 29, 2008 . . . .

43. Mr. Green also testified that he had many "back-up plans" following his buyout. He volunteered for a political campaign and hoped to work for his candidate in Washington D.C., but his candidate lost the election. Mr. Green also "dreamed of" opening a bookstore. Mr. Green also hoped to make some money playing golf leisurely.

*Id.* at 29-38 (citations omitted).

[8]     Based on these findings, the trial court concluded Green was entitled to additional compensation from the PCF:

7. The Court after looking at all expenses to Mr. Green's eye and the expenses he will incur in the future to keep his eye from going blind calculated a total of $167,842.94. However, Dr. Anderson's testimony at the hearing showed this is a very common condition of stroke patients and therefore Mr. Green's compensation for his damage should be reduced. The Court determined Mr. Green should only receive thirty-nine percent of the total eye cost because this was the chance of recovery if Mr. Green had properly been treated with tPA at Wishard Hospital. Therefore, Mr. Green will receive $65,692.75 for the damage to his eye from Wishard's negligence.

* * *

9. The evidence established that Mr. Green would have suffered from fatigue, stamina issues, and some level of physical deficits from his stroke even with successful tPA treatment. Those limitations more likely than not would have prevented Mr. Green from returning to work as an assembly line operator.

10. Even if Mr. Green had been physically capable of returning to work, the automobile industry was in an economic downfall in 2007 through 2009, and into 2010. There is no evidence that any auto company was hiring[,] to the extent that Mr. Green had viable job prospects in the auto industry during that time.

11. The Court after taking all these factors into consideration for possible job opportunities after Mr. Green's buyout, finds Mr. Green is not entitled to [compensation for] lost earning capacity because he still would have experienced a stroke which would have highly impaired his capabilities to work. The Court also concludes Mr. Green had not taken sufficient affirmative steps to seek employment prior to his stroke to make any future earnings anything more than speculation. However, the court takes these "back-up plans" into consideration when figuring Mr. Green's loss of enjoyment of life.

12. Mr. Green also may not recover economic damages for lost

real estate investments. No evidence supports Mr. Green's claim that he lost real estate investments as a result of his injury. Mr. Green's own testimony established that at the time of the underlying negligence, he owned no real estate investment properties. All investments were purchased after his injury without any evidence that Mr. Green's physical disabilities affected his ability to make such investments or affected the income generated from those investments. . . . Thus, this claim for loss of real estate investment income is speculative and not related to Mr. Green's injury.

13. Mr. Green has experienced significant decrease in function due to the negligent treatment, which adversely affects Mr. Green's ability to enjoy life. The Court recognizes the severe effect Wishard's negligence had on Mr. Green's golf game, which gravely reduces Mr. Green's enjoyment of life because golf has always been a major portion of his life. . . .

14. Wishard's negligence has also caused Mr. Green to live an extremely restricted lifestyle. Mr. Green can no longer travel like he once could and his daily activities are limited to a certain parameter from his house. . . .

15. The Court finds that Mr. Green's damages for the aggravation of his condition, the injury associated with the corneal scarring, pain and suffering, and loss of enjoyment of life are $550,000.00. After giving the [PCF] full credit for the $250,000.00 paid by the health care provider, this court finds that Mr. Green is entitled to an additional award of $300,000.00.

*Id.* at 39-42 (citations omitted).

[9]     Green promptly filed a motion to correct error, arguing the trial court erred by awarding only $300,000.00 in additional compensation. The trial court denied the motion, and this appeal followed.

# Discussion and Decision

## I. Standard of Review

The trial court in this case entered special findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). In reviewing a judgment based on such findings, we must first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Atterholt v. Robinson*, 872 N.E.2d 633, 638-39 (Ind. Ct. App. 2007). "[T]he court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Randles v. Ind. Patient's Comp. Fund*, 860 N.E.2d 1212, 1219 (Ind. Ct. App. 2007) (citation omitted), *trans. denied*. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Johnson v. Wysocki*, 990 N.E.2d 456, 460 (Ind. 2013). "In either case, we must be left with the firm conviction that a mistake has been made." *Id.* (citation and internal quotation marks omitted). When the specific issue on appeal relates to the award of damages, we will affirm the damage award if it was "within the scope of the evidence before the trial court." *Smith v. Washington*, 734 N.E.2d 548, 550 (Ind. 2000). In conducting our review, we consider only the evidence favorable to the judgment and the reasonable inferences to be drawn therefrom. *Samples v. Wilson*, 12 N.E.3d 946, 950 (Ind. Ct. App. 2014). We do not reweigh the evidence. *Id.*

## II. Increased Risk of Harm

[11] Under the Indiana Medical Malpractice Act, the total recovery in a medical malpractice action is limited to $1,250,000.00. Ind. Code § 34-18-14-3(a)(3). The liability of a qualified health care provider is limited to the first $250,000.00 in damages. Ind. Code § 34-18-14-3(b). If a judgment fixes damages in excess of the health care provider's liability, the patient may recover damages from the PCF. Ind. Code § 34-18-14-3(c). Recovery of excess damages from the PCF is allowed only after the health care provider has paid the first $250,000.00, Ind. Code § 34-18-15-3, or agreed to a settlement in which the present payment of money and the cost of future payments exceeds $187,000.00, Ind. Code § 34-18-14-4(b).

[12] In a suit to recover excess damages from the PCF following a settlement, "the court shall consider the liability of the health care provider as admitted and established." Ind. Code § 34-18-15-3(5). Nonetheless, if the information is relevant to determining the appropriate amount of damages, the PCF may introduce evidence of a patient's preexisting risk of harm. *Atterholt v. Herbst*, 902 N.E.2d 220, 220-21 (Ind. 2009), *clarified on reh'g*, 907 N.E.2d 528 (Ind. 2009). Our supreme court recently clarified when such evidence is relevant in *Robertson v. B.O.*, 977 N.E.2d 341 (Ind. 2012). Before addressing *B.O.*, however, a brief review of the increased risk of harm doctrine is in order.

[13] A plaintiff generally must prove each of the following elements in a medical malpractice case: (1) the physician owed a duty to the plaintiff; (2) the physician

breached that duty; and (3) the breach proximately caused the plaintiff's injuries. *Cutter v. Herbst*, 945 N.E.2d 240, 247 (Ind. Ct. App. 2011). A plaintiff who proves each of these elements "may recover damages for all injuries the defendant proximately caused." *Ind. Dep't of Ins. v. Everhart*, 960 N.E.2d 129, 135 (Ind. 2012). In *Mayhue v. Sparkman*, 653 N.E.2d 1384 (Ind. 1995), our supreme court recognized the plight of patients who stood a 50% or worse chance of recovery prior to encountering a physician's negligence:

> Where a patient's illness or injury already results in a probability of dying greater than 50 percent, an obvious problem appears. No matter how negligent the doctor's performance, it can never be the proximate cause of the patient's death. Since the evidence establishes that it is more likely than not that the medical problem will kill the patient, the disease or injury would always be the cause-in-fact.

*Id.* at 1387.

[14]     In *Mayhue*, Mr. Sparkman filed suit for loss of consortium after a physician negligently failed to diagnose his wife's cervical cancer. The Medical Review Panel believed the physician did not satisfy the standard of care but concluded his inadequate care was not the proximate cause of Mrs. Sparkman's death. The parties agreed that even if the physician had earlier diagnosed Mrs. Sparkman, she had a less than 50% chance of recovery. Even so, the trial court denied the physician's motion for summary judgment. The physician appealed, and our supreme court affirmed the trial court's denial, adopting the approach set forth in Restatement (Second) of Torts § 323 (1965):

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm . . . .

*Mayhue*, 653 N.E.2d at 1388-89. The court did not address the issue of damages.

[15] In *Cahoon v. Cummings*, 734 N.E.2d 535 (Ind. 2000), two physicians misdiagnosed a patient's esophageal cancer. Following the patient's death, the patient's wife filed suit against the physicians. Both physicians admitted their respective breaches of duty to the patient but denied their breaches proximately caused the patient's injuries. At trial, all experts agreed the patient would probably not have survived, even if he had been properly diagnosed and treated, but the patient's expert testified the patient would have had a 25 to 30% chance of survival with proper diagnosis and treatment. The trial court instructed the jury that the physicians would be liable for full damages if the jury determined their actions were a "substantial factor" in the patient's death. *Id.* at 540. The jury found in favor of the patient's wife and awarded her $269,000.00. The physicians appealed, and our supreme court held, "[U]pon a showing of causation under *Mayhue*, damages are proportional to the increased risk attributable to the defendant's negligent act or omission." *Id.* at 541. "[D]amages for such a claim are to be measured in proportion to the increased risk, and not by the full extent of the ultimate injury[,]" the court explained. *Id.*

at 538.  And because the jury was instructed to award full damages if the defendants' conduct was a "substantial factor" in the patient's death, the degree of increased risk was not quantified.  *Id.* at 541.  Accordingly, the court reversed the judgment and remanded the case for a new trial.

[16]    In *Herbst*, 902 N.E.2d 220, a physician misdiagnosed fulminant myocarditis as pneumonia, and the patient died.  The patient's estate brought a wrongful death action against the physician and the hospital and later entered into a settlement agreement permitting access to the PCF.  The estate filed a petition for excess damages from the PCF, and a bench trial was held.  Although the settlement precluded the PCF from litigating the issue of causation, Ind. Code § 34-18-15-3(5), the PCF "attempted to introduce expert testimony that even with proper care, [the patient] had a less than ten percent chance of surviving the hospitalization . . . ."  *Herbst*, 902 N.E.2d at 222.  The trial court excluded the expert testimony and awarded the estate $1,000,000.00 in damages from the PCF.  The PCF appealed, arguing the trial court erred in excluding evidence relevant to the valuation of damages.  Our supreme court held when a plaintiff seeks excess damages from the PCF after obtaining a settlement from a health care provider in a medical malpractice case, the PCF may introduce evidence of the patient's preexisting risk of harm if it is relevant to establish the amount of damages, even if it is also relevant to liability issues foreclosed by the judgment.  *Id.* at 220-21.  Stated differently, even if a claim was settled, if recovery is limited to damages for increased risk of harm, the PCF is entitled to introduce

evidence of the patient's underlying risk of harm to assist the factfinder in determining the appropriate amount of damages.

[17] Finally, in *B.O.*, 977 N.E.2d 341, our supreme court made clear its holding in *Herbst* applies only in the context of increased risk of harm claims. In *B.O.*, a child was diagnosed with a mild form of cerebral palsy at the age of four. The child's parents filed suit against the health care providers who attended his birth, alleging they "failed to adequately monitor his condition during labor and delivery and then failed to respond when signs of fetal distress appeared." *Id.* at 342. The health care providers agreed to a settlement permitting access to the PCF. Thereafter, B.O.'s parents filed a petition for excess damages from the PCF, and the PCF disclosed expert witnesses prepared to testify that B.O. either does not have cerebral palsy—or if he does, the condition did not result from the conduct of the health care providers at his birth. B.O.'s parents moved for partial summary judgment to limit the issue at trial to the amount of damages and exclude any evidence disputing the existence or cause of B.O.'s condition. The trial court granted partial summary judgment in favor of B.O., and the PCF appealed, arguing the evidence it sought to introduce was "not only relevant, but necessary" to a determination of damages. *Id.* at 344. Our supreme court held the PCF was not entitled to introduce evidence relevant to liability because B.O.'s claim was not brought under *Mayhue*:

> *Herbst* was necessarily limited to *Mayhue* increased risk of harm claims because *Cahoon* established only the measure of damages in cases involving a *Mayhue* claim. It is thus only in *Mayhue* increased risk of harm claims that evidence of underlying risk

would be relevant to both liability and to damages.

Unless a claim is brought under *Mayhue*, *Herbst* is inapplicable. B.O.'s complaint does not allege an increased risk of harm, but rather traditional negligence resulting in personal injury, and therefore *Herbst* does not apply.

*Id.* at 347 (citations, internal quotation marks, and alteration omitted).

# III. Green's Damage Award

The trial court awarded Green $300,000.00 in excess damages from the PCF "for the aggravation of his condition, the injury associated with the corneal scarring, pain and suffering, and loss of enjoyment of life . . . ." Appellant's App. at 42. Green contends the trial court's findings are clearly erroneous because he experienced a TIA in the Wishard emergency room, rather than a stroke, and the administration of tPA could have prevented his stroke.[3] Proceeding from these assertions, Green further contends he is entitled to the statutory maximum in damages, that his medical malpractice claim was settled on traditional negligence principles, and the trial court erred in reducing at least a portion of his damages based on increased risk of harm principles. We conclude the trial court's findings and judgment are not clearly erroneous and affirm the judgment awarding Green an additional $300,000.00.

---

[3] We would note tPA is not used to treat TIAs. Appellee's App. at 243 (Deposition of Dr. Puzio, in which Dr. Puzio states, "If you have a TIA, you don't use tPA.")

# A. Findings of Fact

Green contends the trial court's findings are clearly erroneous for several reasons, each of which amounts to a request for this court to reweigh the evidence. First, Green insists the trial court "did not read" the depositions of the Wishard physicians, which were admitted in their entirety at the bench trial. Appellant's Brief at 18, 27. This argument is disrespectful and entirely unpersuasive, as the trial court's thorough findings demonstrate its careful consideration of all the evidence admitted at trial. The Wishard physicians could not recall treating Green, but Green argues the trial court should have given their testimony greater weight. Specifically, Green argues the fact that they did not observe his neurological symptoms demonstrates he experienced a TIA, the symptoms of which had resolved.[4] In deciding to credit the testimony of Green's children and Green himself over the physicians—whose testimony was based on records that failed to adequately document Green's condition— the trial court found, "the factual testimony of Mr. Green and his children detailing Mr. Green's symptoms of inability to walk or talk, and of left-sided

---

[4] A TIA is a "transient event" often preceding a stroke. Appellee's App. at 165. The stroke-like symptoms of a TIA typically resolve within four hours, and the patient experiences no permanent brain damage as a result. *Id.* at 165, 180. If the symptoms do not resolve and the patient suffers permanent brain damage, the patient has experienced a stroke. *Id.* at 180. Determining whether a patient is experiencing a TIA or a stroke is a matter of timing. As Dr. Puzio explained,

> A TIA, by definition, has reversed. So . . . you can't call it a TIA until after the event was either cleared or completed. In which case, if it's cleared, it's a TIA. If it hasn't cleared then it's a stroke. . . . You don't know if it's a TIA until after you get to the end point of whatever it's going to be . . . .

*Id.* at 243.

weakness are more reliable than the Wishard Hospital Chart, which fails to document anything about Mr. Green's neurologic status." Appellant's App. at 31. The trial court as factfinder was entitled to weigh the evidence and credit the testimony of certain witnesses over others, and we will not second guess its determination.

[20] Green also argues he could not have experienced a stroke at Wishard because his facial drooping was first documented at St. Vincent the following day. Green relies on the testimony of his optometrist, Dr. Anderson, who stated seventh nerve palsy causes facial drooping within an hour of a stroke. Given the Wishard physicians' total failure to document *any* of Green's neurological symptoms, we are not persuaded. Green's children testified their father exhibited facial drooping while he was in the emergency room at Wishard. Likewise, in his petition for excess damages, Green stated he "presented to the Emergency Room at [Wishard] on March 29, 2008 with *facial drooping* and inability to stand up and maintain his balance . . . ." Appellant's App. at 7 (emphasis added). We will not reweigh the evidence.

[21] Finally, in order to compute proportional damages in a medical malpractice case, statistical evidence is admissible to determine the increased risk of harm attributable to the defendant's negligence. *Cutter*, 945 N.E.2d at 248. Green argues the trial court's findings are clearly erroneous because the trial court credited Dr. Puzio's "speculative" testimony on the effectiveness of tPA. As our supreme court explained, once the admissibility of an expert's opinion is established under Evidence Rule 702, "the accuracy, consistency, and

credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact." *Bennett v. Richardson*, 960 N.E.2d 782, 786-87 (Ind. 2012) (citation and internal quotation marks omitted). Green characterizes Dr. Puzio's testimony as "pure speculation" based on "probabilities and statistics" but does not challenge the admissibility of his opinions under Evidence Rule 702. Appellant's Br. at 27. Green points to no evidence in the record contradicting Dr. Puzio's evaluation, and all of the physicians who testified to the effectiveness of tPA agreed stroke patients often retain neurological deficits even after tPA treatment. Green's own expert, Dr. Carter-Miller, stated tPA is aimed at "mitigating the damage," not "becoming symptom free." Appellee's App. at 200. The trial court's findings concerning the effectiveness of tPA are not clearly erroneous.

## B. Judgment

[22]   The trial court concluded Green was entitled to an additional $300,000.00 "for the aggravation of his condition, the injury associated with the corneal scarring, pain and suffering, and loss of enjoyment of life . . . ." Appellant's App. at 42. The trial court did not award damages for lost earning capacity, and at least a portion of the award was reduced to reflect the degree of risk attributable to the defendants' negligence:

> The Court after looking at all expenses to Mr. Green's eye and the expenses he will incur in the future to keep his eye from going blind calculated a total of $167,842.94. However, Dr. Anderson's testimony at the hearing showed this is a very

common condition of stroke patients and therefore Mr. Green's compensation for his damage should be reduced. The Court determined Mr. Green should only receive thirty-nine percent of the total eye cost because this was the chance of recovery if Mr. Green had properly been treated with tPA at Wishard Hospital. Therefore, Mr. Green will receive $65,692.75 for the damage to his eye from Wishard's negligence.

*Id.* at 39-40.[5]

[23] Green contends the trial court's judgment is clearly erroneous because the underlying settlement was based on traditional negligence principles, not increased risk of harm principles. He argues the claim must have been settled on traditional negligence principles because he did not allege increased risk of harm in the complaint. He also believes he is entitled to $1,000,000.00 in excess damages. We disagree on both counts. Although liability was established by the settlement, the settlement agreement did not specify the theory of recovery. *See* Pl.'s Ex. 6. And we do not agree Green's characterization of the claim in the pleadings necessarily determines the proper theory of recovery. Certainly plaintiffs would prefer to prove causation by traditional means and thereby recover full damages, but in cases where the patient stood less than a 50% chance of recovery prior to encountering medical negligence, permitting the plaintiff to recover full damages "would hold doctors

---

[5] It is unclear whether the trial court reduced any other portion of the damage award based on the probability of a patient having minimal or no disability after receiving tPA.

liable not only for their own negligence, but also for their patients' illnesses, which are not the product of the doctors' actions." *Cahoon*, 734 N.E.2d at 541.

[24] We acknowledge *B.O.* states *Herbst* did not apply because "B.O.'s complaint does not allege an increased risk of harm," but *B.O.* is readily distinguishable. *B.O.*, 977 N.E.2d at 347. In *B.O.*, the malpractice claim arose from a physician's failure to adequately monitor and respond to signs of fetal distress during labor and delivery, resulting in brain injury. B.O.'s parents filed a malpractice claim, which the health care provider settled prior to trial. Thereafter, when his parents filed a petition for excess damages, the PCF disclosed expert witnesses who intended to dispute the existence or cause of B.O.'s injury. Our supreme court held the PCF was not entitled to introduce the testimony because it was evident B.O.'s claim sounded in traditional negligence. *Id.* Because B.O. did not have a preexisting injury or condition aggravated by medical negligence, the evidence the PCF proffered was not relevant to the question of damages.

[25] By contrast, Green's CT and MRI scans revealed he experienced several small strokes prior to his acute ischemic stroke on March 29, 2008:

> These small, old strokes were not transient ischemic attacks, because they resulted in permanent damage to Mr. Green's brain. Dr. Puzio opined that these prior micro strokes resulted in reduced brain tissue reserve that made a full recovery medically improbable, even with prompt administration of tPA therapy. Dr. Puzio also explained that the moderate blockage of Mr. Green's basilar artery and the previous small strokes demonstrate a history of "very chronic undertreated hypertension."

Appellant's App. at 34. And because Green's symptoms on March 29, 2008, never resolved, the medical experts agreed Green was experiencing a stroke in the Wishard emergency room—a condition that preceded the negligence at issue. Green maintains he was injured by the physicians' failure to promptly administer tPA, but tPA is not always effective. According to a study cited by Dr. Janicki and Dr. Puzio, only 39% of patients who receive tPA within three hours of a stroke have minimal or no disability three months later. In the same study, 26% of patients who received a placebo also had minimal or no disability three months later. Based on Green's current disability, Dr. Puzio opined Green would have had a one in eight (12.5%) chance of having minimal or no disability if he had received tPA in a timely fashion at Wishard. Yet, the trial court reduced only a portion of Green's damage award, and only by 61%.[6]

[26] The trial court's judgment is not clearly erroneous because the damage award was within the scope of the evidence before the trial court. Where recovery is limited to damages for increased risk of harm because the patient stood less than a 50% chance of recovery prior to encountering the physician's negligence, the trial court may consider evidence of the patient's underlying risk in order to determine the appropriate amount of damages. "[D]amages for such a claim are to be measured in proportion to the increased risk, and not by the full extent of the ultimate injury." *Cahoon*, 734 N.E.2d at 538.

---

[6] The PCF makes the same observation but does not challenge the damage award in this case. *See* Brief of Appellee at 24 n.1.

# Conclusion

[27] The trial court's findings and judgment are not clearly erroneous. We therefore affirm the judgment awarding Green $300,000.00 from the PCF.

[28] Affirmed.

Najam, J., and Crone, J., concur.