

FILED

Oct 09 2018, 5:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Steven K. Hahn
Allyson R. Breeden
Molly E. Briles
ZIEMER STAYMAN WEITZEL &
SHOULDERS, LLP
Evansville, Indiana

Karl L. Mulvaney
Margaret M. Christensen
BINGHAM GREENEBAUM
DOLL LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Robert R. Faulkner
Evansville, Indiana

H. Wayne Turpin
Evansville, Indiana

Richard L. Schultheis
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

St. Mary's Ohio Valley Heart Care, LLC, et al.,

*Appellants-Defendants,*

v.

Derek F. Smith,

*Appellee-Plaintiff*

October 9, 2018

Court of Appeals Case No.
82A05-1711-PL-2594

Appeal from the Vanderburgh Circuit Court

The Honorable David D. Kiely, Judge

Trial Court Cause No.
82C01-1405-PL-317

**Altice, Judge.**

## Case Summary

In 2012, Elizabeth G. Butler, M.D. (Dr. Butler) removed a portion of Derek F. Smith's lower left lung during a surgery that began with a wedge resection and biopsy. Pathologist Hongyu Yang, M.D. (Dr. Yang) provided intraoperative analysis of frozen section pathology slides (frozen slides) of the specimen. Dr. Yang interpreted the frozen slides as cancerous or suggestive of cancer and communicated his findings to Dr. Butler, who then proceeded with a lobectomy. The permanent section slides (permanent slides), which could not be read until the following day, however, revealed that the biopsy specimen was benign.

Smith filed a medical malpractice action against Dr. Butler, St. Mary's Ohio Valley Heart Care, LLC, St. Mary's Medical Center, and Ohio Valley Heart Care, Inc. (collectively, the Surgical Defendants), as well as Dr. Yang and Tri-State Pathology Associates (collectively, the Pathology Defendants). The Medical Review Panel (the Panel) unanimously found in favor of the Surgical Defendants and the Pathology Defendants. To rebut the Panel's findings, Smith submitted the affidavit of E. Allen Griggs, M.D., J.D. (Dr. Griggs), an

expert in pathology, who opined that Dr. Yang violated the pathological standard of care in his diagnosis of the frozen slides in this case.

[3] The Surgical Defendants and the Pathology Defendants both filed motions for summary judgment, which were denied by the trial court. They now bring an interlocutory appeal, pursuant to Indiana Appellate Rule 14(B), of the denials of summary judgment.

[4] We reverse and remand.

## Facts & Procedural History

[5] On February 14, 2012, Smith sought emergency medical treatment due to shortness of breath and wheezing. An x-ray of his chest was abnormal, and a subsequent CT scan revealed a 1.3 cm noncalcified lesion on his left lower lung. Smith's treating physician at the time noted that the lung mass did not "look terribly suspicious in a nonsmoker" and that Smith was to follow up with a pulmonologist for further evaluation. *Appellants' Appendix Vol. 2* at 117.

[6] Pulmonologist Victor Chavez, M.D. (Dr. Chavez) evaluated Smith on March 9, 2012, and obtained a history from him, which included that Smith had "worked in a coal mine, strip mine for the last 30 years." *Id.* at 137. Dr. Chavez opined that the lung mass had a benign appearance but ordered a repeat chest CT in May to assess the lesion's stability. The chest CT, performed on May 21, 2012, revealed that the mass had increased in size from about 15 mm in length to 20

mm in length. As a result, Dr. Chavez referred Smith to Dr. Butler, a cardiothoracic surgeon, for a biopsy and possible lobectomy.

[7] On May 30, 2012, Smith had a preoperative appointment with Dr. Butler, who evaluated Smith, assessed his treatment history, and reviewed the CT scans and a more-recent PET scan. Dr. Butler noted that Smith, although a nonsmoker, lived with two smokers and that he had worked in the coal mines for the last thirty years. Dr. Butler obtained informed consent from Smith to perform a biopsy of the left pulmonary nodule and a possible lobectomy if cancer was present. The surgery was scheduled for the following day at St. Mary's Medical Center in Evansville.

[8] While in the operating room on May 31, 2012, Dr. Butler performed a wedge resection of the left lower lobe of Smith's lung, and the specimen was sent to the pathology lab for intraoperative consultation and analysis of frozen slides. Dr. Yang had difficulty interpreting the slides and consulted with his partner. Ultimately, Dr. Yang determined that the frozen slides were highly suspicious of cancer.

[9] Dr. Yang communicated his diagnosis via intercom into the surgery suite. According to Dr. Butler's operative notes, the frozen slides "came back bronchoalveolar carcinoma." *Id*. at 169. Dr. Yang, however, avers that he informed Dr. Butler at the time that the frozen slides were "very difficult to interpret and not straightforward" but that they were "suggestive of a well-differentiated adenocarcinoma with bronchioalveolar features." *Id*. at 193. Dr.

Butler does not recall Dr. Yang qualifying his diagnosis, but she testified during her deposition that pathologists often relay diagnoses in terms of "suspicious or suggestive" of cancer. *Id.* at 198. Regardless of whether Dr. Yang used the definitive or the suggestive language, Dr. Butler testified that she would have proceeded with the lobectomy as she did. Dr. Butler explained:

> In a patient who has spent 30 years in the coal mines, who presented with dyspnea, who was followed by a pulmonologist, who has a mass that has enlarged on CT scan, who lived with two smokers, I think that there is, given the entire clinical picture, a good chance that if a pathology frozen section demonstrates cancer, I would go ahead and do a lobectomy….[W]e are treating the entire clinical picture. That's often why a pathologist may say suggestive but they are not privy to all the studies and patient history that the surgeon has reviewed.

*Id.* at 199-200. Dr. Butler testified that she planned to perform the lobectomy unless "the diagnosis of the frozen section at the time was clearly not cancerous". *Appellants' Appendix Vol. 3* at 16. The lobectomy resulted in a reduction of Smith's lung capacity by approximately twenty percent.

[10] The day after the lobectomy, Dr. Yang examined the permanent slides and continued to find the slides difficult to interpret. Accordingly, he sent the slides and tissue blocks to Thomas V. Colby, M.D. of the Mayo Clinic (Dr. Colby), a renowned expert in the field, for a second opinion. Dr. Colby determined that the permanent slides were all benign but noted the difficulty of making a diagnosis based on the frozen slides:

I think this case illustrates one of the classic traps at frozen section. Scarring and metaplasia may be an extremely difficult diagnosis at the time of frozen section…. I think the original wedge biopsy shows marked peribronchiolar metaplasia which is a well known mimic of what used to be called bronchioloalveolar carcinoma. This is a reflection of some bronchiolar scarring….

*Appellants' Appendix Vol. 2* at 184. After receiving Dr. Colby's report, Dr. Yang completed his final surgical pathology report on June 8, 2012, with a final diagnosis indicating no evidence of malignancy identified. Dr. Yang communicated the discrepancies between the final diagnosis and the frozen section diagnosis with Dr. Butler that same day.

[11] Smith initiated this medical malpractice action in May 2014 against Dr. Butler, Dr. Yang, their respective practice groups, and the hospital where the lobectomy was performed. Pursuant to the Indiana Medical Malpractice Act, Smith also submitted his proposed complaint for consideration by the Panel. The Panel members included two cardiothoracic surgeons and one pathologist. On March 11, 2015, after reviewing the written submissions of the parties, the Panel entered its unanimous expert opinion in favor of each of the defendants, concluding that the evidence did not support the conclusion that any of the defendants failed to meet the applicable standard of care as charged in the complaint.

[12] On August 14, 2015, Smith filed his amended complaint seeking damages from the Surgical Defendants and the Pathology Defendants. Smith disclosed one expert witness, Dr. Griggs, to rebut the Panel's findings regarding the Pathology

Defendants. Dr. Griggs provided an affidavit in January 2016 and was deposed in December 2016. In Dr. Griggs's expert opinion, Dr. Yang should have deferred his diagnosis of the "unusual tumor" until he could review the permanent section slides. *Id*. at 91. Dr. Griggs, however, testified that he would not have faulted Dr. Yang for offering a leaning along with the deferred diagnosis (*i.e.* that the slides were suggestive of cancer). Dr. Griggs conceded that the frozen slides could not have been called normal/benign at the time and that they had characteristics that were in fact suggestive of cancer.

[13] The Pathology Defendants and the Surgical Defendants filed separate motions for summary judgment on May 30, 2017, and June 29, 2017, respectively. Following a summary judgment hearing, the transcript of which has not been provided on appeal, the trial court denied both summary judgment motions in September 2017. Thereafter, the Pathology Defendants and the Surgical Defendants sought certification of the summary judgment orders for interlocutory appeal pursuant to App. R. 14(B)(1), which the trial court granted. On December 15, 2017, this court accepted jurisdiction pursuant to App. R. 14(B)(2) and consolidated the two appeals under the current cause number. The trial court's denial of the motions for summary judgment is now properly before us. Additional information will be provided below as needed.

## Discussion & Decision

[14] Our standard of review of a summary judgment decision is well-settled. Summary judgment shall be granted where "the designated evidentiary matter

shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Trial Rule 56(C). "We construe all evidence in favor of and resolve all doubts as to the existence of a material issue in favor of the non-moving party." *Stafford v. Szymanowski*, 31 N.E.3d 959, 961 (Ind. 2015). In Indiana, generally the nonmovant is not required to come forward with contrary evidence until the party seeking summary judgment demonstrates the absence of a genuine issue of material fact. *Id*. "In medical malpractice cases, however, a unanimous opinion of the medical review panel that the physician did not breach the applicable standard of care is ordinarily sufficient to establish prima facie evidence negating the existence of a genuine issue of material fact entitling the physician to summary judgment." *Id*. Consequently, in such situations, the burden shifts to the plaintiff, who may rebut with expert medical testimony in order to survive summary judgment. *Id*.; *see also Bhatia v. Kollipara*, 916 N.E.2d 242, 245 (Ind. Ct. App. 2009). "Failure to provide expert testimony will usually subject the plaintiff's claim to summary disposition." *Bhatia*, 916 N.E.2d at 246.

### The Surgical Defendants

[15] The Surgical Defendants argue that they are entitled to summary judgment because Smith failed to present expert testimony rebutting the Panel's unanimous opinion in favor of Dr. Butler. Smith does not dispute that he presented no expert testimony regarding the standard of care applicable to Dr. Butler or whether she breached that standard of care. He argues, instead, that the doctrine of *res ipsa loquitur* applies, making expert testimony unnecessary.

[16] Like other negligence actions, a medical malpractice plaintiff must prove that the defendant owed him a duty and that the defendant breached that duty, which proximately caused an injury to the plaintiff. *Narducci v. Tedrow*, 736 N.E.2d 1288, 1292 (Ind. Ct. App. 2000). "Physicians are not held to a duty of perfect care." *Id*. "Instead, the doctor must exercise the degree of skill and care ordinarily possessed and exercised by a reasonably skillful and careful practitioner under the same or similar circumstances." *Id*. As noted above, expert testimony is generally required to establish the applicable standard of care and to show a breach of that standard. *Id*. "Because medicine is an inexact science, an inference of negligence will not arise simply because there is a bad result without proof of some negligent act." *Id*.

[17] Nevertheless, the doctrine of *res ipsa loquitur* is a limited exception to the general rule that the mere fact of injury will not create an inference of negligence. *Syfu v. Quinn*, 826 N.E.2d 699, 703 (Ind. Ct. App. 2005). It recognizes that "the facts or circumstances accompanying an injury may be such as to raise a presumption, or at least permit an inference, of negligence on the part of the defendant." *Id*. "Application of the doctrine does not in any way depend on the standard of care imposed by law but, rather, depends entirely upon the nature of the occurrence out of which the injury arose." *Id*.

[18] Determining whether the doctrine applies in any given negligence case is a mixed question of law and fact, with the question of law being whether the plaintiff's evidence included all of the underlying elements of *res ipsa loquitur*. *Id*. at 703-04.

> Under the doctrine of *res ipsa loquitur*, negligence may be inferred where 1) the injuring instrumentality is shown to be under the management or exclusive control of the defendant or his servants, and 2) the accident is such as in the ordinary course of things does not happen if those who have management of the injuring instrumentality use proper care.

*Id*. at 704 (quoting *Vogler v. Dominguez*, 624 N.E.2d 56, 61 (Ind. Ct. App. 1993), *trans. denied*). A plaintiff may establish the second element – the one at issue here – by relying on common knowledge or expert testimony. *Id*. Expert testimony is required only when the issue of care is beyond the realm of the layperson. *Id*.

[19] "In the medical malpractice context, application of this exception is limited to situations in which the defendant's conduct is so obviously substandard that a jury need not possess medical expertise in order to recognize the defendant's breach of the applicable standard of care." *Methodist Hosps., Inc. v. Johnson*, 856 N.E.2d 718, 721 (Ind. Ct. App. 2006); *see also Syfu*, 826 N.E.2d at 705 ("expert testimony is not required when the fact-finder can understand that the physician's conduct fell below the applicable standard of care without technical input from an expert witness"). "Such actions have typically arisen from physicians leaving a foreign object in the patient's body; juries can understand without independent explanation that the object should have been removed." *Syfu*, 826 N.E.2d at 705.

[20] Here, Dr. Butler's surgical decision to perform the lobectomy was informed by her review of Smith's medical and social history, as well as Dr. Yang's

intraoperative pathology consultation. Further weighing in on Dr. Butler's decision was the advantage of doing a single surgery rather than waiting for the permanent slides and possibly having to put Smith through the risks of a second thoracic surgery.[1] Dr. Butler testified that regardless of whether Dr. Yang specifically reported to her that the frozen slides revealed cancer or that they were suggestive of cancer, she would have proceeded with the lobectomy under the circumstances presented.

[21]     We agree with the Surgical Defendants that this is not the type of case in which the applicable standard of care is within the realm of the common knowledge of a layperson. *See Naducci*, 736 N.E.2d at 1293-94 (injury and removal of spleen during colon surgery did not trigger the doctrine of *res ipsa loquitur* because it was not "apparent that a fact-finder possesses the knowledge and expertise necessary to render an informed decision on the issue of negligence", including "some understanding of the procedures involved in the colon surgery, the location in the body of the various organs at issue, and the nature of the spleen"). An evaluation of Dr. Butler's conduct and the medical reasons for proceeding with the lobectomy in light of Smith's entire clinical picture clearly require expert testimony, which Smith has not provided. Accordingly, the trial court erred when it denied the Surgical Defendants' motion for summary

---

[1] The risks associated with the surgery included death, infection, bleeding, "prolonged air leak", and "prolonged mechanical ventilation". *Appellants' Appendix Vol. 2* at 146. Additionally, following surgery, Smith would continue to have a chest tube and be in the hospital "as long as the chest tube is in." *Id*.

judgment. On remand, the trial court is directed to enter summary judgment in favor of the Surgical Defendants.

## The Pathology Defendants

[22] We now turn to the denial of the Pathology Defendants' motion for summary judgment.[2] The Pathology Defendants acknowledge that Smith designated expert testimony to rebut the Panel's opinion that Dr. Yang did not breach the applicable standard of care. They argue, however, that Dr. Griggs's testimony failed to create a genuine issue of material fact because he found "no fault with Dr. Yang's intraoperative diagnosis and testified that Dr. Yang did not breach the applicable standard of care in interpreting the frozen slides." *Pathology Defendants Appellants' Brief* at 15. Alternatively, the Pathology Defendants argue that Dr. Butler's testimony reveals that she would have performed the lobectomy had Dr. Yang given any intraoperative diagnosis other than a definitive diagnosis that the lesion was benign and, therefore, the designated evidence establishes a lack of causation.

[23] During his deposition, Dr. Griggs acknowledged that pathologists regularly provide intraoperative diagnoses to surgeons based on frozen slides – even though frozen slides are inferior to permanent slides. "The usual standard of care is a frozen section and then it's turned into a permanent section and

---

[2] Smith argues that the doctrine of *res ipsa loquitur* also applies to the Pathology Defendants. For the reasons set out in the discussion of the Surgical Defendants, it does not apply here either.

finalized that way." *Appellants' Appendix Vol. 3* at 39. According to Dr. Griggs, in the vast majority of cases, a pathologist can make a clear diagnosis (cancerous or noncancerous) based on frozen slides, which are then confirmed with permanent slides. In cases where the frozen slides are inconclusive, Dr. Griggs testified that the pathologist should defer the diagnosis until review of the permanent slides. Dr. Griggs acknowledged that when communicating a deferral to a surgeon intraoperatively, the pathologist may, without deviating from the standard of care, indicate a leaning along with the deferral.

[24] Dr. Griggs's opinion was not contingent on whether Dr. Yang reported intraoperatively that the specimen was cancer or suggestive of cancer. Dr. Griggs explained:

> [M]y concern is that the intraoperative consultation as we see here, suggestive of – would have – they – the pathologist could have had that discussion with the surgeon. Yeah, I think it's suggestive of, but I think it – the frozen section should have been deferred and there should have been a written frozen section diagnosis given to the surgeon. I think that's the standard of care in – in hospitals, an accreditation requirement….[T]he diagnosis would have been positive for cancer or negative for cancer or deferred…. I think what he should have done was defer it here.

*Id*. at 41.[3] Dr. Griggs went on to clarify that the tumor in question was "an unusual tumor" and that "the frozen slides had components that certainly

---

[3] When asked if he would withdraw his criticism if Dr. Yang gave a "less than definitive" cancer diagnosis, Dr. Griggs responded that he would not withdraw his criticism and explained: "I think that by not deferring

closely mirrored or mimicked carcinoma", making the slides difficult to interpret. *Id*. at 41, 45. Although Dr. Griggs would not have faulted Dr. Yang for indicating in a "sidebar conversation" with Dr. Butler that the slides were suggestive of cancer, Dr. Griggs remained critical of Dr. Yang's failure to defer the diagnosis. *Id*. at 48. In Dr. Griggs's opinion, if Dr. Yang had deferred, Smith "would not have lost the lobe of his lung." *Id*. at 44.

[25] The whole of Dr. Griggs's deposition testimony does not definitively and unequivocally demonstrate what the standard of care is and that Dr. Yang breached it. Rather, as set out above, Dr. Griggs testified in terms of what he would have done differently or what Dr. Yang should have done. Dr. Griggs did not testify that it was malpractice not to have deferred the diagnosis, and he expressly indicated that Dr. Yang could have properly stated, along with the deferral, that the frozen slides were suggestive of cancer. *See Oelling v. Rao*, 593 N.E.2d 189, 190-91 (Ind. 1992) ("affirming grant of summary judgment when plaintiff's expert's affidavit stated only how expert would have treated patient differently and did not specifically state that defendant's treatment fell below the applicable standard of care).

[26] But even if Dr. Griggs's testimony establishes a counterpoint to the medical review panel's opinion creating a question of fact as to whether Dr. Yang breached the applicable standard of care, the Pathology Defendants have

it the confusion was allowed to occur. Or the message didn't get across…. I think they should have deferred it then." *Id*. at 48.

designated evidence that Smith's alleged injury was not caused by Dr. Yang's performance.[4] Indeed, the designated evidence establishes that Dr. Butler intended to proceed with the lobectomy unless the intraoperative diagnosis was "clearly not cancerous". *Appellants' Appendix Vol. 3* at 16. Dr. Griggs conceded that such a diagnosis was not appropriate in this case, as the frozen slides were a "tough call" and demonstrated characteristics that were suggestive of cancer. *Id*. at 46. Dr. Colby of the Mayo Clinic similarly noted the difficulty of making a diagnosis based on the frozen slides in this case. Given that the slides were difficult to interpret and were suggestive of cancer, along with Smith's entire clinical picture and patient history, Dr. Butler's deposition testimony reveals that she would have proceeded with the lobectomy regardless of whether Dr. Yang deferred with a lean, indicated that the slides were suggestive of cancer, or diagnosed the specimen as cancerous. Smith has designated no contrary evidence that Dr. Butler, the ultimate decisionmaker regarding the lobectomy, would have changed course had Dr. Yang provided an intraoperative diagnosis of inconclusive and deferred for analysis of the permanent slides the next day. *See Carey v. Ind. Physical Therapy, Inc*., 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010) ("Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct."), *trans. denied*. Thus, the designated

---

[4] In a medical malpractice action, a plaintiff generally must establish three elements: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused the plaintiff's injuries. *See Green v. Robertson*, 56 N.E.3d 682, 692 (Ind. Ct. App. 2016), *trans. denied*.

evidence presents no question of fact regarding causation. On remand, the trial court shall enter summary judgment in favor of the Pathology Defendants.

[27] Judgment reversed and remanded.


Najam, J. and Robb, J., concur.