Donald **HIBLER**, Individually and as Class Representative of a Class Composed of All Current and Future Holders of Term Life Insurance Policies Issued by Conseco, Inc. or any of Its Life Insurance Subsidiaries, and Administered Pursuant to Conseco's Home ·Office Policy Benefits, Procedures, and Claims Departments, Appellant–Plaintiff,

v.

**CONSECO, INC.**, Conseco Life Insurance Company and all subsidiary Life Insurance Companies of Conseco, Inc. Whose Policy Benefits, Premiums, and Claims are Jointly Administered, Appellees–Defendants.

and

Lewis & Kappes, on behalf of itself and all others similarly situated, Appellant–Plaintiff,

v.

National Fidelity Life Insurance Company and Conseco, Inc., et al., Appellees–Defendants.

No. 29A02–0002–CV–67.

Court of Appeals of Indiana.

March 20, 2001.

James R. Fisher, Debra H. Miller, Ice Miller Donadio & Ryan, Indianapolis, IN, Douglas D. Church, Church Church Hittle & Antrim, Noblesville, IN, Attorneys for Appellants.

Steven K. Huffer, Scott A. Weathers, Huffer & Weathers, P.C., Indianapolis, IN, Attorneys for Appellees.

## OPINION

KIRSCH, Judge.

In this consolidated appeal, Lewis & Kappes ("L & K") and Donald Hibler each appeal adverse summary judgment rulings in favor of National Fidelity Life Insurance Company ("National"), Conseco, Inc., Conseco Life Insurance Company and certain of its subsidiary companies (collectively, "Conseco") and present the following restated issues for our review:

   I.     Whether a life insurance policy issued to L & K by National was canceled prior to the death of the insured.

   II.    Whether National and Conseco were entitled to judgment as a matter of law on L & K's claim for punitive damages.

   III.   Whether Hibler lacked standing to bring a class action complaint for declaratory relief.

We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY [1]

### I.  The Lewis & Kappes Policy

At all times here relevant, National was a subsidiary of Conseco, Inc. which provided certain administrative and claims service to its subsidiaries, including National. In 1985, National issued a whole life policy in the face amount of $100,000 on the life of Ted B. Lewis, a partner at the law firm of Lewis Kappes Fuller & Eads, now L & K. L & K was both the owner and beneficiary of the policy. Near the end of 1990, L & K decided to replace the National policy with a policy from General American Life Insurance Company ("General American"). In order to avoid any gap in coverage, L & K paid its quarterly premium to National in December 1990, making coverage effective through March 10, 1991. Pursuant to insurance regulation, General American sent a letter to National on December 10, 1990, advising National that it had received an application for life insurance coverage on the life of Lewis, which coverage was intended to replace the National coverage.[2]

On January 18, 1991, L & K partner David Gray sent a letter to National requesting that National (1) immediately cancel its policy covering Lewis, and (2) issue a refund to L & K of prepaid premium. Gray enclosed with his letter a form document called "Statement of Lost Policy."[3] The Statement of Lost Policy form indicated that because the partnership owned the policy, all partners must sign it. However, only Gray executed the document. National received the letter and

---

1.  We heard oral argument in this case in Indianapolis on October 17, 2000. We commend counsel for the quality of their advocacy.

2.  General American accepted the application, issued the policy, and ultimately paid a $100,000 death benefit to L & K on Lewis's life.

3.  L & K had never received a copy of its policy and, because National apparently required the return of the policy for cancellation, L & K obtained the Statement of Lost Policy form from National.

Statement of Lost Policy on January 24, 1991.

That same date, and in response to L & K's request to cancel, Conseco sent L & K another document called a Surrender Agreement and a form cover letter, upon which two boxes had been checked as follows:

"2. To enable us to process this request, please:

[X] Complete and return the enclosed forms [4]

[X] Owned by Partnership, need signatures of all partners."

*L & K Record* at 103.

Upon receipt of the Surrender Agreement from Conseco, L & K began the process of obtaining all the partners' signatures on the Surrender Agreement. L & K employee Judy Parry prepared a separate signature page, with a line for each partner, and circulated the Surrender Agreement for signature by taking it to each partner's office for his signature. Parry signed the Surrender Agreement as a witness, referencing the attached signature page. National received the executed Surrender Agreement on February 7, 1991.

Thereafter, on February 22, 1991, National sent a letter to L & K stating in pertinent part: "We have received your request to surrender the above numbered contract. However, this policy lapsed effective February 10, 1991, and there is no surrender value or refund of premium to be returned." *L & K Supp. Record* at S–17. On the same date that National sent this letter, it generated a premium refund check covering the period from February 10 to March 10 and placed it in a suspense account.

On March 20, 1991, Lewis died unexpectedly. On March 29, 1991, L & K sent a letter to National, signed by all its partners, advising that L & K desired to rescind and withdraw its previous offers of cancellation of the policy on Lewis. The letter enclosed a tendered premium check for the March 10 payment, but did not mention that Lewis had died. National received the letter on or about April 1.

In response to this letter, Kristin Chevrier (now Kristin Jessup), a supervisor in National's Policy Benefits Department, inquired into the L & K policy and learned of the February 22 letter. On April 2, 1991, Chevrier called L & K, spoke with partner David Gray, and explained to him that the February 22 letter contained two errors: (1) the policy did not lapse due to nonpayment of premium on February 10, 1991, but rather canceled pursuant to National's receipt of the executed Surrender Agreement on February 7, 1991; and (2) a premium refund was, in fact, due to L & K for the period of February 10, 1991 through the paid-up date of March 10, 1991. Chevrier sent a letter to Gray on April 3, 1991, confirming the substance of the telephone conversation. Unaware of Lewis's death, Chevrier stated in her letter that Lewis's policy could be reinstated, subject to underwriting approval.

On April 8, 1991, L & K sent a letter to Chevrier informing National of Lewis's death and of L & K's intent to pursue the $100,000 death benefit on the basis that the policy was never canceled.

On April 10, 1991, Robert Burkett, Jr., associate general counsel for National, and claims counsel for all of Conseco's life insurance subsidiaries, sent a letter to Gray stating that no coverage was in effect on the date of Lewis's death and coverage ended when L & K initially requested cancellation by letter on January 18, 1991. Burkett's letter enclosed a check representing "a refund of all premiums due you," which in fact covered the period of February 10 through March 10. *L & K Supp. Record* at S–19. Burkett also returned to L & K its March 10 tendered premium.

---

**4.** Although the letter indicates more than one form was enclosed, i.e., complete and return the enclosed forms, only the Surrender Agreement was enclosed with the letter.

Protracted litigation ensued, beginning with L & K's complaint against National, filed in Marion Superior Court on October 2, 1991, and later amended on December 8, 1992. Count I sought recovery of the $100,000 death benefit, and Count II alleged a violation of the Indiana Unfair Claims Practices Act, breach of contract, and requested an award of punitive damages. After a change of venue to Hancock County, on November 3, 1992, National filed a motion for summary judgment on Count I of L & K's complaint, which sought recovery of the $100,000 death benefit. L & K filed a cross-motion for summary judgment. On August 30, 1993, the trial court granted National's motion for summary judgment on Count I of the complaint, finding that the policy canceled as a matter of law on January 24 when National received L & K's January 18 letter and, because Lewis died after the cancellation of the policy, L & K was not entitled to the death benefit under the policy. *L & K Record* at 200–01.

On April 5, 1999, six years after the August 30, 1993 summary judgment order, L & K filed a motion to reconsider the court's ruling on Count I of the amended complaint based upon certain testimony elicited during a 1995 deposition of Alison Claypole, Senior Vice President of Insurance Operations of Conseco Services. Claypole testified that Conseco's practice at that time was not to cancel a policy of insurance until it received all the appropriate forms, leaving coverage in force during that period. On May 6, 1999, Conseco and National filed a motion for partial summary judgment as to any claim for punitive damages under Count II of the amended complaint.

On October 25, 1999, after briefing by both parties, the court denied L & K's motion to reconsider the August 30, 1993 ruling and granted National and Conseco's motion for partial summary judgment as to punitive damages. *L & K Record* at 433. L & K sought and received certification of the interlocutory order. After filing the notice of appeal, the case was consolidated with related appeal, *Hibler et al. v. Conseco, et al.*, discussed *infra.*

## II. The Hibler Policy

On December 4, 1998, Conseco issued a term life insurance policy to Hibler. On December 21, 1998, Hibler filed a class action complaint in Hancock County for declaratory relief seeking a binding interpretation of policy cancellation requirements.

On September 20, 1999, Conseco moved for judgment on the pleadings seeking dismissal of Hibler's complaint under T.R. 12(C) for lack of standing. On October 21, 1999, Hibler filed a motion for summary judgment. After a hearing on December 3, 1999, the trial court granted Conseco's motion, which it treated as one for summary judgment, and dismissed Hibler's complaint on January 3, 2000. The trial court determined that Hibler failed to establish that he had sustained, or was in imminent danger of sustaining, some direct injury as a result of Conseco's conduct. *Hibler Record* at 350. This appeal ensued, ultimately consolidated with L & K's interlocutory appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

L & K and Hibler both appeal adverse summary judgment rulings issued from different courts. When reviewing a grant or denial of summary judgment, our well-settled standard of review is the same as it was for the trial court: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Thomas v. Victoria Fire & Cas. Ins. Co.*, 706 N.E.2d 212, 214 (Ind.Ct. App.1999), *trans. denied.* Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Thomas,* 706 N.E.2d at 214. Here, the essential facts are not in dispute. Therefore, our task is to determine the law applicable to the undisputed

facts and whether the trial court correctly applied the law. *Id.* A trial court's ruling on a motion for summary judgment reaches this court clothed with a presumption of correctness. *Id.* When reviewing the trial court's ruling we will affirm on any theory supported by the material properly designated to the trial court. *Id.*

## II. Policy Cancellation

■ In Indiana, the term "cancellation" refers to the termination of a policy prior to the end of the policy period. *American Family Mut. Ins. Co. v. Ramsey,* 425 N.E.2d 243, 244 (Ind.Ct.App.1981). Here, L & K admits that it fully intended, and indeed twice attempted, to cancel the life insurance policy on Lewis's life. It asserts, however, that its efforts were ineffective and indeed expressly rejected by National, first when National sent it the Surrender Agreement (in response to L & K's initial letter of January 18 requesting cancellation), and again when National sent the February 22 letter stating that the policy had lapsed. Thus, it argues, cancellation was never accomplished, thereby entitling it to the $100,000 death benefit.

■ As a general rule, once a valid contract of insurance has been effectuated, the right of either party to cancel it at pleasure can accrue in only three ways: by a concurrent agreement, by a reservation in the policy, or by statute. *Cook v. Michigan Mut. Liab. Co.,* 154 Ind.App. 346, 352, 289 N.E.2d 754, 758 (1972) (quoting *Bushnell v. Krafft,* 133 Ind.App. 474, 479, 183 N.E.2d 340, 343 (1962)). *See also* 3A JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 1811 at 17 (Supp.2000) (insured has no power to terminate policy except by virtue of powers provided by policy, statute, or mutual agreement with insurer); 3 ERIC M. HOLMES, HOLMES' APPLEMAN ON INSURANCE 2D § 16.7 at 355 (2d ed.1998) (insurer can perform cancellation in manner provided by statute or in policy, by consent with insured, or by an action brought for that purpose); 2 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 30.1 (3d ed.1997) (right to cancel a con-

tract of insurance must arise either by virtue of statute, contract itself, by express mutual consent of the parties, or by reason of some breach, and in the absence of such authority, neither party has any right to cancel); 45 C.J.S. *Insurance* § 485 (1993) (cancellation of policy of insurance may be effected by mutual agreement, or under contractual or statutory provision authorizing cancellation). The parties do not cite any applicable statutory provision regarding termination, and we are not aware of any such provision. Thus, if cancellation occurred in this case, it did so either according to the policy's terms or by a concurrent agreement.

■ We first examine whether L & K's policy contained a cancellation clause. If so, L & K must have strictly complied with the terms of it in order to effect cancellation. *Bushnell,* 133 Ind.App. at 479, 183 N.E.2d at 343 (if right to cancel is reserved it can only be exercised by compliance with contractual arrangements pertinent thereto or by mutual agreement to cancel and waiving the contractual restrictions). *See also* 3 HOLMES, *supra,* § 16.7 at 354 (where right to cancel exists only by contract, cancellation clause is a condition requiring strict compliance to make an attempted cancellation valid); *id.* at 342 (generally a cancellation must be effected in strict compliance with pertinent policy provisions); 45 C.J.S., *supra,* § 512 (surrender or cancellation of a policy by insured must be made in accordance with any requirements imposed by policy). If indeed L & K satisfied the terms of any contractual provision, no further action on the part of National was required. 2 RUSS & SEGALLA, *supra,* § 31.35 (when insured cancels unilaterally, by definite unconditional request to cancel that is communicated to insurer, cancellation is accomplished and it is not required that insurer approve or accept the cancellation, consent thereto, or send written notice of cancellation); 45 C.J.S., *supra,* § 512 (if policy provides that insured has the privilege of canceling policy at his pleasure, company's

consent is not a prerequisite to cancellation, and no formal cancellation or physical defacement is required).

■ In this case, the only provision of L & K's policy conceivably applicable to the cancellation of coverage is Section 3.6, which states:

> "SURRENDER BENEFIT—*While this policy is in force as paid up, reduced paid up, or extended term insurance, you may turn it in with a written request that we pay its net cash value.* We may defer payment not more than six months. If you turn in this policy within 31 days after any policy anniversary, the net cash value will not be less than the value on the anniversary."

*L & K Supp. Record* at S–3 (emphasis added).

L & K argues on appeal that Section 3.6 applies to this case and, because it never returned the properly executed Statement of Lost Policy, it did not comply with the policy provisions, and the policy did not cancel. National, however, contends that there is no evidence that the whole life policy in question was paid-up, reduced paid-up, or extended term insurance, and therefore Section 3.6 is wholly inapplicable. After examining the policy, we agree with National.

The policy in question contains no separate definition section to aid us in our analysis. However, Section 3.5, which immediately precedes Section 3.6, provides the policy's owner with certain options in the event a premium is not paid. Within 60 days of the due date of any unpaid premium, the owner may request the net cash value of the policy, which is defined in a prior section, as "the cash value less any outstanding loans." *L & K Supp. Record* at S–2. Alternatively, in certain defined circumstances, the owner may purchase with the policy's net cash value reduced paid-up insurance or extended term insurance. The relevant provisions of Section 3.5 state in pertinent part:

> "Reduced Paid–Up Insurance—This policy becomes paid-up for the reduced face amount of insurance that the net cash value ... will buy at Insured's current age.... The amount of reduced paid-up is what the net cash value will purchase when applied as a net single premium at the Insured's current age on the due date of the unpaid premium. Paid-up insurance is insurance that does not require the payment of any additional premiums by you.
>
> Extended Term Insurance—This policy continues in force for the extended term that the net cash value ... will buy at Insured's current age. Amount of extended term insurance is the face amount less any outstanding loans. The term period of the extended insurance is what the net cash value will purchase when applied as a net single premium at the Insured's current age on the due date of the unpaid premium."

*L & K Supp. Record* at S–3.

As stated, Section 3.6 provides for the surrender of a policy while that policy is paid up, reduced paid-up or extended term insurance, accompanied by a request for the policy's net cash value. Here, the Record contains no evidence that L & K's policy, purchased in 1985, had at any time a net cash value. Nor does the Record indicate that the policy was paid-up, reduced paid-up, or extended term insurance. Accordingly, we conclude that Section 3.6 plays no role in the determination of this issue.

■ Having concluded that no statute or contract provision controls, we next examine whether cancellation occurred by mutual or concurrent agreement. A mutual agreement need not take any particular form, but the elements of a contract must be present in order to establish the termination of an insurance policy by mutual consent. 3A APPLEMAN & APPLEMAN, *supra*, § 1811 at 17 (agreement can be in any form and can be made dependent upon a condition, but must partake of the elements of contract); 2 RUSS & SEGALLA, *supra*, § 31.35 (elements of a contract must be present in order to give rise to a termination by mutual agreement); 45

C.J.S., *supra*, § 489 (same). For a contract to form, there must be a meeting of the minds whereby both parties, each party acting with knowledge of the material facts, agree to the cancellation. 3 HOLMES, *supra*, § 16.7 at 355 (when no right to cancel is reserved in the policy, consent of other party thereto is essential); 45 C.J.S., *supra*, § 507 (in the absence of a contractual provision or a statute, insured has no right to cancel and terminate policy without insurer's consent); *id.*, § 485 (when a life insurance policy is silent as to cancellation, in absence of fraud or misrepresentation, neither party can cancel policy without approval of other party); 3A APPLEMAN & APPLEMAN, supra, § 1811 at 104 (1981) (regardless of the policy provisions, protection can be terminated by mutual agreement, but there must be meeting of the minds of the parties, each party acting with knowledge of the material facts).

■■■ The consent of the parties may be express or implied from the circumstances. *Cook*, 154 Ind.App. at 353, 289 N.E.2d at 758 (concurrence of parties in rescission of contract may be shown by their express agreement or by their respective acts); *American Family Mut. Ins. Co. v. Jones*, 739 F.2d 1259, 1263 (7th Cir.1984) (under Indiana law, once a valid contract of insurance is created, parties may cancel contract by mutual agreement, and an agreement to cancel may be demonstrated by the parties' respective acts). *See also* 2 RUSS & SEGALLA, *supra*, § 31.55 (agreement to cancel may be evidenced by acts of both parties); 45 C.J.S., *supra*, § 489 (termination of insurance policy by mutual consent is based on parties' intent, and it is immaterial whether such intent is manifested by words or conduct).

■■■ Because the policy contained no provision for cancellation, L & K's letter of January 24, 1991, wherein it requested that National cancel the policy of insurance and return any unused premium, constituted the initial offer. In response, National neither accepted nor rejected the offer but sent the Surrender Agreement to L & K with the accompanying form cover

letter stating that in order to process this request all partners of L & K must sign the agreement. L & K's partners executed the Surrender Agreement in the presence of witness Parry and mailed it back to National, who received it on February 7, 1991. L & K's execution and return of the Surrender Agreement constituted a new offer. National's February 22 letter to L & K, which stated that the policy had lapsed and no premium refund was due, cannot be construed as an acceptance. Indeed, at no time did National manifest an intention to be bound to the cancellation until the telephone call of April 2, 1991. Prior to this date, namely March 29, 1991, L & K had rescinded its offer; thus, the acceptance of April 2, 1991 is of no effect. As a result, there was no concurrence of the offer and acceptance; hence, no concurrent agreement to terminate the policy was formed. The policy was in full force and effect on March 20, 1991, the date of Lewis' death. We, therefore, reverse summary judgment for Conseco and remand with instruction to enter summary judgment for L & K.

### III. Punitive Damages

L & K's complaint sought recovery of punitive damages for breach of contract based upon: (1) Conseco's cancellation practices, including forms, procedures, and alleged misrepresentations relative to policy cancellation; and (2) Conseco's premium refund practices, which constituted a systematic and wrongful reduction in refunds to policyholders. L & K also claimed entitlement to punitive damages based upon alleged retaliatory threats made by Conseco's corporate counsel that were intended to deter L & K from pursuing its claim.

■■■ Under Indiana law, in order for a plaintiff to recover punitive damages from a breach of contract claim, the plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded. *USA Life One Ins.*

*Co. of Indiana v. Nuckolls,* 682 N.E.2d 534, 541 (Ind.1997) (citing *Miller Brewing Co. v. Best Beers,* 608 N.E.2d 975, 984 (Ind.1993)). An insurance company has a duty to deal with its insured in good faith, and the breach of that duty allows for a cause of action in tort. *Id.* (citing *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 519 (Ind.1993)). Proof that a tort was committed does not necessarily establish the right to punitive damages. *Id.* Punitive damages may be awarded only if there is clear and convincing evidence that the defendant "acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." *Id.* (quoting *Erie Ins. Co.,* 622 N.E.2d at 520).

■ Initially, we address L & K's argument that summary judgment is not an appropriate method for resolution of a punitive damages bad faith claim because it necessarily hinges upon state of mind, which is inherently an issue of fact for the jury to decide and depends in part upon such matters as witness credibility. We reject this argument, however, as our supreme court has expressly held that a court may grant summary judgment to resolve a punitive damages bad faith claim. *USA Life,* 682 N.E.2d at 541 (citing *Breeck v. City of Madison,* 592 N.E.2d 700, 703 (Ind.Ct.App.1992), *trans. denied*). *See also American Family Life Assur. Co. v. Russell,* 700 N.E.2d 1174, 1178 (Ind.Ct. App.1998), *trans. denied* (1999) (summary judgment for life insurer on claim for punitive damages held proper where there was no evidence of malice, fraud, gross negligence or oppressiveness). Having held that a court may resolve a punitive damages claim by summary judgment, we now turn to whether doing so in this case was appropriate.

At the time of Lewis death in 1991, Conseco's cancellation practice was, upon a written request from the insured for can-

cellation, to send the policyholder additional required forms for completion, such as the Statement of Lost Policy or the Surrender Agreement. Conseco considered cancellation effective only upon its receipt of the properly completed forms from the policyholder. The premium refund, if any, was then calculated according to a monthaversary method, by which premiums were refunded from the date of the month when the policy commenced. For instance, in this case, National received the Surrender Agreement from L & K on February 7, 1991, but the 10th of the month was the day of the month that the policy commenced; therefore, the refund was calculated from February 10 through March 10, the date through which the policy had been prepaid.[5]

■ L & K asserts that Conseco's cancellation practice systematically misappropriated premiums from insureds by refusing to cancel upon an insured's first request and requiring the insured to complete and return extra-contractual forms. Under the facts of this case, we disagree. This particular policy was silent as to cancellation. Consequently, Conseco was under no duty to do anything, including cancel the policy. *See* 2 RUSS & SEGALLA, *supra,* § 30.1 (recognizing that neither party has right to cancel the policy in the absence of statute, contract provision, or express mutual agreement). However, until it agreed to cancel coverage, Conseco retained the corresponding obligation to provide coverage during any and all times that it held an insured's premium. So long as Conseco, in fact, remained on the risk for an insured's death, we cannot conclude that it misappropriated L & K's premium when it did not return the premium immediately upon request.

■ L & K also argues that the monthaversary method of premium refund calculation allowed Conseco to retain some portion of the premium even after Conseco

---

5. On November 4, 1993, National tendered an additional $426.65 in refunded premium to L & K, pursuant to the trial court's August 30, 1993 summary judgment ruling.

had received all the required forms. For example, in this case, even if the policy had canceled on February 7 when National received the Surrender Agreement, National only refunded from February 10, the monthaversary date of the policy. Conseco responds with several arguments. First, the practice did not result in any net gain to Conseco because in some cases the insured received free coverage. For instance, if the monthaversary date was the 10th of the month, but the forms were not received until the 25th, the refunds would be calculated from the 10th even though coverage would have been provided through the 25th of the month, resulting in free coverage to the insured. Second, Conseco understood the monthaversary method of premium refund calculation to be an accepted practice within the industry. Third, the L & K policy does not forbid that manner of premium refund calculation. Under these facts, we cannot conclude that the alleged conduct misappropriates premiums or otherwise satisfies the culpable state of mind necessary to support a claim of bad faith.

■■■ Next, L & K asserts that Conseco's internal policy was to engage in an impermissible "wait and see" approach. Specifically, L & K claims that if an insured happened to die before the extra-contractual forms were completed and returned, then Conseco stated that the policy canceled at the insured's first request, in order to avoid payment of a death benefit. If, however, the insured did not die before the forms were completed and returned, then Conseco waited until it received all the forms, and calculated any refund from that date, thereby allowing Conseco to earn additional money on the withheld premiums.

In the designated material in the Record before us, there is evidence sufficient to create a question of fact whether the delay in the present case was pursuant to such policy or was the result of inadvertence. First, the Record indicates that during the time herein relevant, Conseco neither expressly agreed to cancellation of the policy, nor rejected L & K's request. Rather, they requested a Surrender Form signed by all partners. Given that under Indiana law the signature of a partner will bind the partnership, there is a question of fact whether this requirement was reasonable or was a hurdle imposed pursuant to the alleged "wait and see" approach. *See* IC 23–4–1–9 (under Uniform Partnership Act, every partner is an agent of the partnership for the purpose of its business, and the act of a partner binds the partnership except in certain defined circumstances). Second, upon receipt of the form with the required signatures, Conseco did not process the cancellation request and refund the unearned premium, but misrepresented to L & K that the policy had lapsed and there was no unearned premium. Third, on the same day that National misrepresented to L & K that there was no unearned premium, it issued a check to a corporate suspense account in the amount of the unearned premium from February 10 to March 10.

Taken together, these facts give rise to an inference of bad faith sufficient to withstand a motion for summary judgment. We, therefore, reverse summary judgment on this issue and remand for further proceedings.

## IV. Standing

■■■ Hibler contends that the trial court erred in determining that he lacked standing to bring his declaratory judgment class action complaint. Hibler, the owner of a Conseco term life insurance policy, is the proposed class representative of a class defined as: all current and future holders of insurance policies issued by Conseco and its subsidiaries that may in the future elect to request cancellation of such policies, or who would otherwise become entitled to a refund of premiums, or who may experience a covered claim arising after the date of requested cancellation of such policy but prior to cancellation being acknowledged by Conseco or its subsidiaries. *Hibler Record* at 5, 11. His declaratory judgment complaint sought to

establish a binding interpretation of the policy's cancellation requirements. Generally, Hibler requested a declaration that: (1) coverage ends on the date when the insurer receives a written request to cancel, which complies with those requirements specifically set forth in the policy or which are communicated in writing to the insured before the policy is issued; and (2) the company is required to refund any unearned premium from the date of coverage termination. The trial court determined that he lacked standing to bring a declaratory judgment class action suit. *Hibler Record* at 352. We agree.

The Declaratory Judgment Act provides:

"Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

IC 34–14–1–2. In order to obtain declaratory relief, the person bringing the action must have a substantial present interest in the relief sought. *Town of Munster v. Hluska*, 646 N.E.2d 1009, 1012 (Ind.Ct. App.1995). The basis of jurisdiction under the Declaratory Judgment Act is a justiciable controversy or question, which is clearly defined and affects the legal right, the legal status, or the legal relationship of parties having adverse interests. *Nass v. State ex rel. Unity Team*, 718 N.E.2d 757, 764–65 (Ind.Ct.App.1999), *trans. denied* (2000).

Although the Indiana constitution contains no "case or controversy" requirement, the federal limits on justiciability are instructive, because the standing requirement under both federal and state constitutional law fulfills the same purpose: ensuring that the litigant is entitled to have the court decide the merits of the dispute or of particular issues. *See Schulz*

*v. State*, 731 N.E.2d 1041, 1044 (Ind.Ct. App.2000), *trans. denied.* The standing doctrine constitutes a significant restraint upon the ability of Indiana courts to act as it denies courts any jurisdiction absent actual injury to a party participating in the case. *Jones v. Sullivan*, 703 N.E.2d 1102, 1105 (Ind.Ct.App.1998). It restricts the courts to real controversies in which the complaining party has a demonstrable injury. *Schulz*, 731 N.E.2d at 1044 (citing *Collard v. Enyeart*, 718 N.E.2d 1156, 1159 (Ind.Ct.App.1999)). In order to establish standing, a plaintiff must demonstrate a personal stake in the outcome of the lawsuit and must show that he has sustained or is in immediate danger of sustaining some direct injury as a result of the conduct at issue. *Id.* (citing *Schloss v. City of Indianapolis*, 553 N.E.2d 1204, 1206 (Ind. 1990)). We find that Hibler failed to satisfy this requirement.

Hibler urges reversal because there is no other mechanism to force Conseco to identify and maintain a consistent procedure for cancellation. We are not persuaded, however, that Conseco is under any obligation to do so. As stated above, there is at least at present—no statutory right of cancellation. In the absence of statute, insurers may issue policies which are silent regarding cancellation provisions. Potential insureds are free to contract as they please, and no one is under any obligation to purchase a policy that does not outline cancellation procedures. *See* 2 RUSS & SEGALLA, *supra,* § 30.14 (recognizing that parties to insurance contract may validly contract as they please with respect to cancellation). Hibler asks the court to modify a contract into which he voluntarily entered and to expand both his rights and the insurer's obligations. This, we decline to do.

We conclude, as did the trial court, that Hibler failed to establish that he sustained, or was in imminent danger of sustaining, some direct injury as a result of the conduct at issue.

Affirmed in part, reversed in part, and remanded with instructions.

DARDEN, J., concurs.

FRIEDLANDER, J., concurs in part and dissents in part with separate opinion.

FRIEDLANDER, Judge, concurring in part and dissenting in part

The majority concludes that certain questions of fact exist that render summary judgment inappropriate with regard to whether the life insurance policy on Lewis had been cancelled at the time of his death. I agree with the majority's conclusion that the summary judgment motion should be resolved in favor of L & K on that issue. I disagree, however, with the majority's determination that a question of fact remains as to whether L & K is entitled to punitive damages.

Our supreme court has set forth the following principles to guide us in cases such as this:

> The erroneous denial of coverage does not necessarily violate an insurance company's duty of good faith. Furthermore, proof that a tort was committed does not necessarily establish the right to punitive damages. Punitive damages may be awarded only if there is clear and convincing evidence that defendant "acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing."

*USA Life One Ins. Co. of Indiana v. Nuckolls,* 682 N.E.2d 534, 541 (Ind.1997); (quoting *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 520 (Ind.1993)). The foregoing reflects that the bar of eligibility for punitive damages in this context has been set at a considerable height. After reviewing the designated evidence, I believe that Conseco has met its burden of proving that L & K did not satisfy that rigorous standard and thus is not entitled to punitive damages.

That evidence reflects that, among other things, L & K persisted in its efforts to terminate the life insurance policy shortly before Lewis's death. In responding, Conseco did not immediately cancel the policy, but instead informed L & K that it must follow certain procedures in order to accomplish that end. The majority concludes that there are questions of fact concerning whether Conseco engaged in delaying tactics and, if so, the motivation behind those actions. In effect, the majority holds that there is evidence to support a conclusion that the procedure employed by Conseco when responding to requests to cancel permits it to take inconsistent positions with respect to the timing and effect of an insured's attempt to cancel coverage. As a result, according to the majority, Conseco arguably is able to have it both ways. It can deem the cancellation effective immediately upon receipt of the first request, or it can deem the effort ineffective until receipt of certain signed forms and thereby collect premiums for the time period between the initial notification and cancellation. Under this scenario, Conseco's financial benefit is the factor that ultimately determines which of the two dates prevails.

It is an undeniable fact that insurance companies sometimes wrongfully deny claims. I have no doubt that they occasionally also adopt contradictory positions with respect to the same question pertaining to insurance coverage. In each such situation, it is no doubt often the case that the respective parties advocate a position that is, not coincidentally, one that is in their own financial best interest. In either case, for the purpose of eligibility for punitive damages, the question is not whether a position ultimately proved to be correct, or even whether it was entirely consistent with other positions advocated by the company at one time or another. Rather, the question is whether the particular position adopted here by Conseco was outrageous and unreasonable.

It is clear to me that, given all of the facts and inferences surrounding L & K's claim, Conseco denied coverage in good faith under its interpretation of the relevant policy language. The evidence designated by L & K revealed that L & K interpreted the policy language differently than did Conseco. Thus, L & K's claim for punitive damages rests upon a disagreement over how to interpret the policy. *See USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534. Such is not the stuff of which punitive damages awards are made. I would grant summary judgment in favor of Conseco with respect to the availability of punitive damages.