

ATTORNEYS FOR APPELLANTS

Jerry Garau
Barbara J. Germano
Garau Germano, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

Bryan R. Findley
Julia C. Payne
Mollie A. Slinker
Kian J. Hudson
Deputy Attorneys General
Indianapolis, Indiana

A. Richard M. Blaiklock
Charles R. Whybrew
Lewis Wagner, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Garau Germano, P.C., and Faith Fenner, <br><br> *Appellants-Plaintiffs,* <br><br> v. <br><br> Stephen W. Robertson (Commissioner of the Indiana Department of Insurance and Administrator of the Indiana Patient's Compensation Fund), Indiana Department of | August 19, 2019 <br><br> Court of Appeals Case No. 18A-CT-2739 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable James A. Joven, Judge <br><br> Trial Court Cause No. 49D13-1710-CT-37220 |

Insurance, and Indiana Patient's
Compensation Fund,

*Appellees-Defendants.*

**Mathias, Judge.**

[1] The law firm of Garau Germano, P.C., ("Garau Germano") and its client Faith Fenner ("Fenner") (collectively "the Plaintiffs") filed a complaint for declaratory judgment and mandate against the Indiana Patient's Compensation Fund ("PCF"), the Indiana Department of Insurance ("IDOI"), and Stephen W. Robertson, the Commissioner of the IDOI and the Administrator of the PCF ("the Commissioner") (collectively "the Fund Defendants"). In their complaint, the Plaintiffs sought to prevent the Fund Defendants from requiring that a claimant's periodic payments agreement with a qualified health care provider pay out the provider's maximum liability under the Indiana Medical Malpractice Act ("MMA") before the claimant can gain access to the PCF. The Plaintiffs appeal the trial court's order granting the Fund Defendant's motion to dismiss and present three issues for our review, which we reorder and restate as:

   I.    Whether the Plaintiffs' claim for declaratory judgment is ripe for review;
  II.    Whether the Plaintiffs' claim is justiciable under the Declaratory Judgments Act; and
 III.   Whether Fenner, individually, and Garau Germano, on its own behalf, have standing to bring a complaint for mandate against the Fund Defendants seeking to force them to comply with what they contend to be the requirements of the MMA.

We affirm.

## Statement of Facts[1]

Garau Germano is a law firm that represents over one hundred clients with medical malpractice claims, one of whom is Fenner. Garau Germano's fees are based on the amount its clients recover from the health care providers and the PCF. At the time of the Plaintiffs' complaint in the instant case, Fenner was seventy-three years old. Represented by Garau Germano, Fenner is pursuing a claim for medical malpractice under the MMA, alleging that her husband's death in February 2016 was caused by the negligence of various qualified health care providers.

The MMA, codified at Title 34, Article 18 of the Indiana Code, allows a patient or the representative of a patient to bring a malpractice claim for bodily injury or death. *Atterholt v. Robinson*, 872 N.E.2d 633, 639 (Ind. Ct. App. 2007) (citing Ind. Code § 34-18-8-1; *Goleski v. Fritz*, 768 N.E.2d 889, 891 (Ind. 2002)). The MMA was designed to curtail liability for medical malpractice. *Id*. (citing *Chamberlain v. Walpole*, 822 N.E.2d 959, 963 (Ind. 2005)).

For an act of malpractice that occurs after June 30, 1999 and before July 1, 2017,[2] such as the malpractice alleged by Fenner, the MMA provides that the

---

[1] We take the facts from the Plaintiffs' complaint as true. *Thomas v. Blackford Cty. Area Bd. of Zoning Appeals*, 907 N.E.2d 988, 990 (Ind. 2009) (citing *Huffman v. Ind. Office of Envtl. Adjudication*, 811 N.E.2d 806, 814 (Ind. 2004)).

[2] Indiana Code section 34-18-14-3 was amended effective July 1, 2017 to provide that, for acts of malpractice that occur after June 30, 2017 but before July 1, 2019, the total amount recoverable for an injury or death of a

total amount recoverable for an injury or death of a patient may not exceed $1,250,000. Ind. Code § 34-18-14-3(a)(3). A qualified health care provider is liable for the initial $250,000 of damages,[3] and the remainder of the judgment or settlement amount is paid from the PCF.[4] *Id*. § 34-18-14-3(b)(1), (c); *Robinson*, 872 N.E.2d at 639. Thus, if a plaintiff obtains a judgment against a health care provider in excess of this $250,000 limit, the remainder of the judgment, up to $1,000,000 (for a total recovery of $1,250,000), is paid from the PCF. *See M.O. v. Ind. Dep't of Ins. Patient's Comp. Fund*, 968 N.E.2d 254, 259 (Ind. Ct. App. 2012) (citing *Atterholt v. Herbst*, 902 N.E.2d 220, 222 (Ind. 2009), *clarified on reh'g*, 907 N.E.2d 528 (2009)), *trans. denied*.

[6]     If a health care provider decides to settle a claim with a plaintiff, there are two ways in which that plaintiff may be eligible to recover additional damages from the PCF. The provider may simply pay the first $250,000. *Green v. Robertson*, 56 N.E.3d 682, 691 (Ind. Ct. App. 2016) (citing Ind. Code § 34-18-15-3(b)), *trans. denied*. The provider may alternatively agree to a settlement involving what is termed a periodic payments agreement.[5] If a provider opts to discharge its

---

patient may not exceed $1,650,000. *Id.* at § 3(a)(4). And for acts of malpractice that occur after June 30, 2019, the total amount recoverable may not exceed $1,800,000. *Id.* at § 3(a)(5).

[3] For acts of malpractice that occur after June 30, 2017 but before July 1, 2019, a qualified health care provider is liable for the first $400,000, and for acts occurring after June 30, 2019, the provider is liable for the first $500,000. *Id.* at § 3(b)(1), (3).

[4] The IDOI, which administers the PCF, funds the PCF by levying an annual surcharge on all health care providers. *See* Ind. Code §§ 34-18-5-1 to 35-18-5-4.

[5] A "periodic payments agreement" is defined by statute as:

    a contract between a health care provider (or its insurer) and the patient (or the patient's estate), under which the health care provider is relieved from possible liability in consideration of:

possible liability through such a periodic payments agreement, then "the amount of the patient's recovery from a health care provider in a case under this subsection is the amount of any immediate payment made by the health care provider or the health care provider's insurer to the patient, plus the cost of the periodic payments agreement to the health care provider or the health care provider's insurer." Ind. Code § 34-18-14-4(b).

[7] In cases, such as this one, where the act of malpractice occurred after June 30, 1999 but before July 1, 2017, to determine the limitations on recovery stated in Indiana Code subsections 34-18-14-3(b) and -(3)(d):

> the sum of the present payment of money to the patient (or the patient's estate) by the health care provider (or the health care provider's insurer) plus the cost of the periodic payments agreement expended by the health care provider (or the health care provider's insurer) must exceed:
>
> (1) one hundred eighty-seven thousand dollars ($187,000)[.]

I.C. § 34-18-14-4(b).[6]

---

(1) a present payment of money to the patient (or the patient's estate); and

(2) one (1) or more payments to the patient (or the patient's estate) in the future;

whether or not some or all of the payments are contingent upon the patient's survival to the proposed date of payment.

Ind. Code § 34-18-14-2.

[6] If a provider opts to enter into a periodic payments plan to discharge its possible liability for an act of malpractice that occurs after June 30, 2017, the limitation on recovery is "(2) seventy-five percent (75%) of the maximum amount a health care provider is responsible for under section 3(b) and 3(d) of this chapter[.]"

[8]     In other words, to determine whether a provider has reached the limits on its liability, thereby triggering access to the PCF, the total cost of the present payment to the patient plus the cost of procuring a periodic payments agreement must exceed $187,000. *See Herbst*, 902 N.E.2d at 222 ("Recovery of excess damages from the Fund is allowed only after a health care provider or the provider's insurer has paid the first $250,000, or made a settlement in which the sum of the present cash payment and cost of future periodic payments exceeds $187,000.") (citations omitted); *Green*, 56 N.E.3d at 691 (noting that a claimant may gain access to the PCF by agreeing to a settlement in which the present payment of money and the cost of future payments exceeds $187,000) (citing Ind. Code § 34-18-14-4(b)).

[9]     The Plaintiffs claim that the Fund Defendants do not follow the language of the statute as explained in *Herbst* and *Green* and impose an additional non-statutory requirement before allowing a claimant access to the PCF. Specifically, they allege that the Fund Defendants also require that a periodic payments agreement pay out the provider's maximum liability before allowing a claimant to access the PCF. In other words, not only must the cost of the present payment plus the cost to procure a periodic payments agreement exceed $187,000, but the amount of the present payment plus total amount paid out over time must also equal $250,000.[7]

_____

[7] Garau Germano sent a letter to the IDOI's counsel advising it of Garau Germano's interpretation of the periodic payments statute. In response, the IDOI informed Garau Germano that the Fund Defendants would

[10]     The Plaintiffs assert that the MMA does not require a periodic payments agreement to pay out the health care provider's maximum liability and instead contend that a claimant may gain access to the PCF merely by entering into a settlement agreement where the present payment, plus the cost to the provider to procure a period payments agreement, costs more than $187,000. *See Herbst*, 902 N.E.2d at 222; *Green*, 56 N.E.3d at 691.

[11]     Such periodic payments are usually procured by the provider purchasing an annuity.[8] Interest rates are now very low. Thus, in order to purchase an annuity where any present payment plus the total amount paid out of the annuity over time amounts to $250,000 requires the future payments to be paid out over decades. This is an issue with an elderly plaintiff such as Fenner, who, in order to gain access to the PCF, might agree to a settlement including an annuity that would not pay out over her expected lifetime. This, the Plaintiffs contend, "forces older claimants to forfeit a portion of a recovery which is already limited by the terms of the [MMA]," whereas "younger victims of medical malpractice can structure their annuities in such a way that they likely will receive the payments in their lifetime[.]" Appellants' Br. at 10.

---

not grant claimants access to the PCF "unless the periodic payments agreement results in a payout of the health care provider's maximum liability." Appellants' App. p. 34.

[8] Both parties agree that a common arrangement in such cases includes the immediate payment of $150,000 to the claimant plus purchasing an annuity for $37,001 that will, over time, pay out the remaining $100,000. This meets the $250,000 limit required of provider liability and, according to the Fund Defendants' interpretation, triggers access to the PCF.

[12] Garau Germano alleges that it often settles claims with health care providers via periodic payments agreements that grant its clients access to the PCF. Garau Germano represents Fenner and many similarly situated clients "who face the effective forfeiture of a portion of their already limited settlements because of the Fund Defendants' requirement that periodic payments agreements pay out the health care provider's maximum liability." *Id.* at 11. Because of the Fund Defendants' policy, Garau Germano claims that it cannot advise its clients to accept a periodic payments agreement that costs over $187,000 but that does not pay out the health care provider's maximum liability over time.

[13] Fenner claims she is therefore unable to evaluate any potential settlement offers or options because of the Fund Defendants' interpretation of the MMA. Fenner alleges that if she were to purchase an annuity as part of a settlement, she "may be required to essentially forfeit a portion of any settlement she receives from the defendant health care providers in her action." Appellants' App. p. 35. She does not, however, allege that she has received any actual settlement offers.

## Procedural History

[14] On October 3, 2017, Garau Germano filed a verified complaint for mandate against the Fund Defendants, which sought a mandate to prohibit them from requiring that a claimant's periodic payments agreement pay out the health care provider's maximum liability before granting that claimant access to the PCF.

[15] On January 12, 2018, the Fund Defendants filed a motion to dismiss Garau Germano's complaint for lack of standing. In response, on March 20, 2018, Garau Germano filed an amended complaint, adding Fenner as a plaintiff and the Commissioner as a defendant. The amended complaint also included a request for declaratory judgment. On April 29, 2018, the Fund Defendants again moved to dismiss the complaint.

[16] The trial court held a hearing on the motion to dismiss on August 14, 2018, and issued an order dismissing the case on October 26, 2018. The trial court concluded that Garau Germano lacked standing to bring the suit, that Fenner's claim was not ripe for review because she had not alleged that she was entitled to access to the PCF, and that the Plaintiffs' claims were not the appropriate subject of an action for mandate because they were not alleging that they were entitled to a ministerial act. The Plaintiffs now appeal.

## Standard of Review

[17] The trial court granted the Fund Defendants' motion to dismiss, filed pursuant to Indiana Trial Rule 12(B)(6), for failure to state a claim upon which relief could be granted. We have noted before that:

> Indiana Trial Rule 12(B)(6) tests the legal sufficiency of a claim, rather than the facts supporting it. We review a trial court's grant or denial of a Trial Rule 12(B)(6) motion to dismiss de novo, viewing the complaint in the light most favorable to the non-moving party and drawing every reasonable inference in favor of that party. We must stand in the trial court's shoes, looking only at the complaint itself, and determine whether the trial court erred when it applied the law. Where it is clear that the facts

alleged in the complaint are insufficient to support relief under any set of circumstances, the trial court's grant of the motion to dismiss is proper.

*Tillman v. Tillman*, 70 N.E.3d 349, 351 (Ind. Ct. App. 2013) (citations omitted), *trans. denied*.

## I. *The Plaintiffs' Claim for Declaratory Judgment Is Not Ripe*

[18] The Plaintiffs first argue that the trial court erred in concluding that their claim for declaratory judgment is not yet ripe[9] under the Declaratory Judgment Act. The relevant portion of this Act provides:

> Any person interested under a deed, will, written contract, or other writings constituting a contract, **or whose rights, status, or other legal relations are affected by a statute**, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Ind. Code § 34-14-1-2 (emphasis added). In order to obtain a declaratory judgment, the person bringing the action must have a substantial present interest in the relief sought. *Redevelopment Comm'n of Town of Munster v. Ind. State*

---

[9] The Fund Defendants address the Plaintiffs' argument on this issue as one of standing instead of ripeness. As explained by one commentator, "[t]he justiciability doctrine is broken down into four major categories: standing (who may sue), ripeness (when would the suit be appropriate), mootness (no longer an active dispute), and political question (controversy should be left to the political branches)." 4 Charles H. Koch, Administrative Law & Practice § 13:1 (3d ed. 2010); *see also Hulse v. Ind. State Fair Bd.*, 94 N.E.3d 726, 732 (Ind. Ct. App. 2018) (distinguishing standing from ripeness). Although these concepts are related, we consider the Plaintiffs' argument as being that their claims are ripe.

*Bd. of Accounts*, 28 N.E.3d 272, 276 (Ind. Ct. App. 2015) (citing *Hibler v. Conseco, Inc.*, 744 N.E.2d 1012, 1023 (Ind. Ct. App. 2001)), *trans. denied*. "'The basis of jurisdiction under the Declaratory Judgment Act is a justiciable controversy or question, which is clearly defined and affects the legal right, the legal status, or the legal relationship of parties having adverse interests.'" *Id*. (quoting *Little Beverage Co., Inc. v. DePrez*, 777 N.E.2d 74, 83 (Ind. Ct. App. 2002), *trans. denied*).

[19]   A court may not review an issue that is not ripe. *Cavallo v. Allied Physicians of Michiana, LLC*, 42 N.E.3d 995, 1001 n.3 (Ind. Ct. App. 2015) (citing *Thomas ex rel. Thomas v. Murphy*, 918 N.E.2d 656, 662–63 (Ind. Ct. App. 2009), *trans. denied*). "In essence, 'ripeness relates to the degree to which the defined issues in a case are based on actual facts rather than on abstract possibilities[.]'" *Brogan v. State*, 925 N.E.2d 1285, 1289 (Ind. Ct. App. 2010) (quoting *Rene ex rel. Rene v. Reed*, 726 N.E.2d 808, 822 (Ind. Ct. App. 2000)). "The basic rationale behind our ripeness doctrine is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Ind. Gas Co. v. Ind. Fin. Auth.*, 977 N.E.2d 981, 989–90 (Ind. Ct. App. 2012), *trans. granted, summarily aff'd in relevant part*, 999 N.E.2d 63 (Ind. 2013) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998)). As noted in *Indiana Gas Co.*, "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not

occur as anticipated, or indeed may not occur at all.'" *Id.* (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). A court's ruling on a ripeness challenge must consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Brogan*, 925 N.E.2d at 1289 (quoting *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201 (1983)).

[20] Here, the Plaintiffs argue that their claim is ripe for a declaratory judgment because Fenner is pursuing a claim for medical malpractice against several qualified health care providers under the MMA and does not know how to proceed. They claim that, if Fenner accepts a settlement that includes a periodic payments agreement that costs over $187,000, the Fund Defendants will deny her access to the PCF unless the total payout also equals the provider's maximum liability of $250,000, contrary to what the Plaintiffs contend to be the plain language of the relevant statute. The Plaintiffs argue that to require Fenner to enter into a settlement now is to require her to take a "shot in the dark" and hope that she will be successful in arguing that their interpretation of the statute is correct. If so, she will have access to the PCF. But if not, she may be deprived of further benefits from the PCF, and Garau Germano may be liable for misadvising its client.

[21] Our problem with this argument is that it presupposes that Fenner has a valid claim for medical malpractice, will eventually enter into a settlement agreement with the providers who she claims have committed malpractice, and that this settlement will include a periodic payments agreement that costs at least

$187,000. Yet the Plaintiffs have not alleged that Fenner has even been offered a settlement, much less entered into a settlement agreement. Because Fenner has not yet received an offer of settlement from any of the providers, the Plaintiffs have no "rights, status, or other legal relations" to be determined under the Declaratory Judgment Act.

[22] For all we know at this stage, Fenner's claims may be meritless. They may also be wholly meritorious. And even if meritorious, her claims may not result in a settlement that includes a periodic payments agreement that costs at least $187,000. Indeed, it may not result in a settlement agreement at all and instead go to trial where the issue of damages will be for the jury to determine. Accordingly, the Plaintiffs' arguments regarding the Fund Defendants' interpretation of the relevant statutes rests on a future contingency that might not occur as anticipated, or might not occur at all. *See Ind. Gas Co.*, 977 N.E.2d at 989–90.

[23] The cases relied upon by the Plaintiffs are therefore distinguishable. For example, in *Indiana Education Employment Relations Board v. Benton Community School Corp.*, the court held that the case before it presented "not merely the 'ripening seeds' of a controversy, but present[ed] an already existing and actual controversy." 266 Ind. 491, 496, 365 N.E.2d 752, 754 (1977). In that case, however, the Education Employment Relations Board had already scheduled a hearing on the appropriate collective bargaining unit. *Id.* Without declaratory relief, the plaintiff would have been required to proceed with a hearing from which, according to the statute at issue, there would have been no judicial

review. *Id*. Thus, there was an actual administrative decision at issue, not merely the potential for a controversy, and the court therefore concluded that "[t]he plaintiff was not merely seeking an advisory opinion[.]" *Id*. at 497, 365 N.E.2d at 754.

[24] Here, however, the Plaintiffs merely allege that there might be an adversary administrative decision (denial of access to the PCF) *if* Fenner enters into a settlement agreement that contains a periodic payments agreement that costs over $187,000 but does not pay out $250,000 over time.

[25] And in *Indiana Department of Environmental Management v. Twin Eagle LLC*, 798 N.E.2d 839 (Ind. 2003), the developer already had a definite plan to develop the property, and regardless of the outcome of IDEM's ultimate determination, the developer would still have to go through an administrative process to determine if its development project required a permit and, if so, whether it could obtain such a permit. Thus, our supreme court held that the developer's claim presented a genuine controversy that was sufficiently ripe for adjudication. *Id*. at 844. In contrast, here, Fenner's claims are still hypothetical because she has yet to obtain any offer for a settlement agreement, much less one that would cost in excess of $187,000. Her claims are, at this point, still purely speculative.

[26] *In re Trust of Peeples*, 37 N.E.3d 502 (Ind. Ct. App. 2015), *trans. denied*, is also distinguishable. In *Peeples*, the trial court approved the appointment of the Johnson County Community Foundation as trustee but capped the Foundation's fees at 1.5% of trust assets annually and further required the

Foundation to obtain court approval before engaging the services of most third parties. The Foundation appealed, arguing that the trial court abused its discretion in imposing these restrictions. The trust beneficiaries countered that the Foundation's argument was not ripe for appeal because the Foundation had presented no evidence that it would ever need more than 1.5% of the trust's assets or ever engage the services of third parties. Our court rejected this argument, holding that the restrictions on the Foundation's "decision-making as trustee will be affected by the limit, even if it does not go to the trial court seeking more money." *Id.* at 512. Also, the Foundation would have to weigh the costs and benefits of petitioning the court to engage the services of third parties. *Id.* These restrictions were "more than abstract possibilities when viewed from [the Foundation's] perspective." *Id.*

[27] Here, however, the Plaintiffs' issues with the Fund Defendant's interpretation of the periodic payments statute is still an abstract possibility, as Fenner has not yet even received an offer of any settlement agreement. Again, her concerns, as things currently stand, rest on a future contingency that might not occur as anticipated or even at all. *See Ind. Gas Co.*, 977 N.E.2d at 990.

[28] The same is true for the other cases cited by the Plaintiffs in support of their claim that they can bring a declaratory action. In these cases, the issues were more than abstract possibilities but actual controversies existing at the time of the action. *See Cmty. Action of Greater Indianapolis, Inc. v. Ind. Farmers Mut. Ins. Co.*, 708 N.E.2d 882, 885–86 (Ind. Ct. App. 1999) (holding that the injured victim of an insured's tort had standing under the Declaratory Judgment Act to

seek a declaration of the insured's coverage under an insurance policy before the tort claim was reduced to judgment), *trans. denied*; *Sendak v. Allen*, 164 Ind. App. 589, 592, 330 N.E.2d 333, 335 (1975) (holding that sheriff's deputies running for sheriff had standing to bring declaratory judgment action regarding the applicability of statute prohibiting police officers from running for office because they were already running for office).

[29] The bottom line is that the question presented by the Plaintiffs is still purely hypothetical. Fenner may enter into a settlement agreement with the providers against whom she is claiming medical malpractice. She may not. She may enter into a settlement including a periodic payments agreement that costs in excess of $187,000. She may not. But now, she has not even received any offers of settlement, much less entered into any agreement. Her ability to access the PCF is, at this stage, contingent upon her either obtaining a judgment against the providers after trial or by entering into a settlement agreement that meets certain requirements. This is not to say that Fenner must necessarily enter into a settlement agreement before her claims are ripe for determination. But there must be more than just the mere hope or anticipation of receiving such a settlement offer before she may seek declaratory judgment. We therefore conclude that the Plaintiffs' claims are not yet ripe for declaratory judgment, and the trial court properly dismissed them for failure to state a claim upon which relief could be granted.

## II.  The Plaintiffs Lack Standing to Seek Judicial Mandate

[30]   The Plaintiffs also argue that the trial court erred by concluding that they did not have standing to seek an action for judicial mandate. We have previously explained the requirement of standing as follows:

> Standing is defined as having a "sufficient stake in an otherwise justiciable controversy." *Ind. Civil Rights Comm'n v. Indianapolis Newspapers, Inc.*, 716 N.E.2d 943, 945 (Ind. 1999). The point of the standing requirement is to ensure that the party before the court has a substantive right to enforce the claim that is being made in the litigation. *Pence v. State*, 652 N.E.2d 486, 487 (Ind. 1995). Standing is "a significant restraint on the ability of Indiana courts to act, as it denies the courts any jurisdiction absent an actual injured party participating in the case." *Id*. at 488.
>
> The standing requirement obligates courts to act only in real cases and shun action when called upon to engage only in abstract speculation. *Id*. An actual dispute involving those harmed is what confers jurisdiction upon the judiciary . . . . *Id*. (quotation omitted). Put simply, in order to have standing, the challenging party must show adequate injury or the immediate danger of sustaining some injury. *Ind. Civil Rights Comm'n*, 716 N.E.2d at 945.

*Redevelopment Comm'n of Town of Munster*, 28 N.E.3d at 276.

[31]   The judicial mandate statute provides:

> An action for mandate may be prosecuted against any inferior tribunal, corporation, public or corporate officer, or person to compel the performance of any:
>
>     (1) act that the law specifically requires; or

(2) duty resulting from any office, trust, or station.

Ind. Code § 34-27-3-1.

[32]     Our supreme court recently explained the narrowness of the remedy provided by this statute, writing:

> Our precedent cautions against issuing a mandate, calling it an *extraordinary* remedy, viewed with *extreme* disfavor. **Judicial mandate is appropriate only when two elements are present: (1) the defendant bears an imperative legal duty to perform the ministerial act or function demanded and (2) the plaintiff has a clear legal right to compel the performance of [that] specific duty**. These two elements represent the narrow limits placed upon judicial mandates. These strictures mean that judicial mandate should never [be] granted in doubtful cases.

*Price v. Ind. Dep't of Child Services*, 80 N.E.3d 170, 174–75 (Ind. 2017) (bold emphasis added) (citations and internal quotation marks omitted).

*A. Fenner Lacks Standing to Seek Judicial Mandate*

[33]     Here, we agree with the Fund Defendants that Fenner has not alleged that the PCF bears an imperative legal duty to perform a ministerial act or function. Instead, Fenner seeks a mandate that the Fund Defendants comply with (what she claims to be) the plain language of the periodic payments statute. As noted by the Fund Defendants, granting a claimant access to the PCF is no simple ministerial act. Indeed, the PCF is not required to approve petitions for access to the PCF simply if they meet certain statutory requirements. That is, even if the claimant enters into a settlement agreement that meets the statutory

requirements for access to the PCF, this does not guarantee that he or she will be awarded damages from the PCF.

[34] Instead, after entering into a settlement agreement that meets the statutory requirements for access to the PCF, a claimant must file a petition in the trial court seeking court "approval of an agreed settlement" and "demanding payment of damages from the [PCF]." Ind. Code § 34-18-15-3(1)(A), (B). Then, the Commissioner and the health care provider (or its insurer) may agree or object to "a settlement with the claimant from the [PCF]." *Id*. at § 3(3). If any of these parties filed objections to the settlement, then the trial court must set the matter for a hearing "as soon as practicable." *Id*. at § 3(4). At the hearing, the Commissioner, the claimant, the health care provider, and the health care provider's insurer may "introduce relevant evidence to enable the court to determine whether or not the petition should be approved if the evidence is submitted on agreement without objections." *Id*. at §3(5). If, however, the parties cannot agree on the amount to be paid out of the PCF, "the court shall, after hearing any relevant evidence on the issue of claimant's damage submitted by any of the parties described in this section, determine the amount of claimant's damages, if any, in excess of the health care provider's policy limits . . . already paid by the insurer of the health care provider." *Id*. The trial court "shall determine the amount for which the [PCF] is liable and make a finding and judgment accordingly." *Id*. However, in determining the amount to be paid

from the PCF, "the court shall consider the liability of the health care provider as admitted and established."[10] *Id.*

[35] Applying this process to the present case, it is clear that, even if Fenner entered into a settlement agreement that met the statutory requirements for access to the PCF, she still may not be granted damages from the PCF. Given this complex, judicial task of determining whether Fenner is entitled to excess damages from the PCF, we agree with the Fund Defendants that this case is not the proper subject of an action for judicial mandate because Fenner is not requesting that the Defendants perform a ministerial task that they have a duty to perform. *See Price*, 80 N.E.3d at 175. She is instead demanding that they interpret the relevant statutes in a specific way. Nor is it yet clear that Fenner has a clear legal right to compel the performance of this task. *See id.* Not only has she not yet entered into a qualifying settlement agreement, even if she had, her ability to receive damages from the PCF is far from established. Because Fenner lacks standing to seek a judicial mandate, the trial court properly dismissed her claim.

*B. Garau Germano Also Lacks Standing to Seek Judicial Mandate*

[36] Lastly, we agree with the trial court that Garau Germano also lacks standing to seek judicial mandate on its own behalf. First, we repeat that judicial mandate is not appropriate in this case as the Plaintiffs do not seek to compel the Fund Defendants to engage in any ministerial task and instead seek to compel the

---

[10] The trial court must also consider many other factors, such as the patient's risk of death and the degree of increased risk of harm caused by the malpractice. *Herbst*, 902 N.E.2d at 220–21.

defendants to adhere to what they believe to be the proper interpretation of the periodic payments plan statute. As noted above, this is not the proper grounds for an action for mandate.

[37] We further agree with the trial court that Garau Germano lacks standing to seek mandate. We reached a similar conclusion in *State ex rel. Steinke v. Coriden*, 831 N.E.2d 751 (Ind. Ct. App. 2005), *trans. denied*. In that case, Steinke was an attorney whose practice included representing clients before the Indiana Worker's Compensation Board. Steinke filed a complaint for judicial mandate seeking to require the members of the Board to comply with various statutory guidelines he believed the members were ignoring.[11] The members of the Board filed a motion to dismiss for lack of standing. Steinke then filed an amended complaint asserting that he also had standing as a member of the general public. The trial court granted the motion to dismiss, and Steinke appealed.

[38] On appeal, Steinke argued that he had standing as an attorney representing clients before the Board and that he was injured because attorneys like him lacked access to a Board composed of full-time members whose "sole focus and loyalty [was] toward the proper administration" of the Worker's Compensation statutes. *Id*. at 754 (record citations omitted). We rejected Steinke's claim of standing, holding that although he presented a "hypothetical scenario in which

---

[11] Specifically, he alleged that the members of the Board "fail[ed] to devote his/her entire time to the discharge of the duties of his/her office" and "[held] other position(s) of trust or profit, and/or engages in some occupation(s) or business(es) interfering with or inconsistent with the discharge of his/her duties." *Id*. at 753 (record citations omitted).

the Board's unavailability could or would delay payments to him," he alleged no incidents where this harm had actually occurred. *Id*. We held that, "[i]n the absence of a showing that he has suffered or will immediately suffer a direct injury," Steinke, as an attorney who represented clients before the Board, had no standing to seek judicial mandate. *Id*.

[39] The same is true in the present case. Garau Germano is a law firm that represents clients in medical malpractice cases. It seeks a judicial mandate that the Fund Defendants follow what Garau Germano believes to be the correct interpretation of the periodic payments plan statute. Garau Germano claims that, given the number of clients it represents, many of these clients will eventually enter into settlement agreements, and that it is unable to advise its clients on how to proceed. But the validity of these clients' claims, like Fenner's, has yet to be determined at this stage. Garau Germano, like Steinke, presents hypothetical situations in which its clients may be denied access to the PCF, but has not shown that it will suffer from any direct injury if mandate is denied. Garau Germano attempts to distinguish the present case from *Steinke*, but we find none of these attempts convincing.

[40] Garau Germano claims that *Steinke* is distinguishable because, in that case, Steinke sought relief only on behalf of all Indiana residents, whereas Garau Germano seeks relief on its own behalf. This is incorrect. The plaintiff in *Steinke,* in addition to claiming standing as a member of the public, also asserted standing "as an attorney affected by the Defendants' failure to fulfill their duties." *Id*. 753 (record citation omitted). Garau Germano further contends

that, unlike the plaintiff in *Steinke*, it is seeking specific action on the part of the Fund Defendants. But as we stated above, Garau Germano seeks to mandate the Fund Defendants to interpret the periodic payments statute in a particular way, not simply to require them to perform a ministerial act.

[41] In short, Garau Germano does not seek a mandate to perform a ministerial act. An action for judicial mandate is therefore inappropriate. Furthermore, Garau Germano has not shown that it has been directly damaged by the Fund Defendants' interpretation of the periodic payments plan statute. For these reasons, we affirm the trial court's motion to dismiss Garau Germano's complaint for judicial mandate for lack of standing.

## Conclusion

[42] The trial court properly dismissed the Plaintiffs' complaint for failure to state a claim upon which relief could be granted. First, the Plaintiffs' claims are not yet ripe for a declaratory judgment, as Fenner has yet to receive, much less accept, any proposed agreement to settle her medical malpractice claims. Furthermore, neither Fenner nor Garau Germano has standing to seek judicial mandate because they do not request the performance of a ministerial act and because neither has demonstrated that they have been or will be directly harmed. We therefore affirm the judgment of the trial court.

[43] Affirmed.

May, J., and Brown, J., concur.